612 P.2d 463 (1980)
AMOCO PRODUCTION COMPANY, a Delaware Corporation, Appellant (Plaintiff),
v.
STAUFFER CHEMICAL COMPANY OF WYOMING, a Delaware Corporation, Appellee (Defendant).
No. 5257.
Supreme Court of Wyoming.
June 9, 1980.
Rehearing Denied July 7, 1980.
*464 William T. Schwartz, Cameron S. Walker of Schwartz, Bon & McCrary, Casper, and R.H. Landt, Denver, Colo., an attorney in good standing of the State Bars of Texas, Oklahoma, and Colorado, admitted specially for the purposes of this case, for appellant.
Blair J. Trautwein of Hathaway, Speight & Kunz, Cheyenne, and Frederick S. Waiss of O'Donnell, Waiss, Wall & Meschke, San Francisco, Cal., an attorney in good standing of the State Bar of California, for appellee.
Before RAPER, C.J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.
ROONEY, Justice.
Appellant-plaintiff filed an action against appellee-defendant: (1) to recover money, with interest, allegedly due under a written contract for the sale of natural gas, and (2) for declaratory relief as to the proper price to be paid by appellee for gas sold by appellant under the contract. Both parties moved for a summary judgment. The trial court denied appellant's motion and granted appellee's motion.
We reverse.
The controversy arose over the application of § 12.3 of the contract, which provides:
"12.3 If at any time and from time to time during the term hereof, the Federal Power Commission or any successor governmental agency shall at any time hereafter prescribe or approve a ceiling price or prices, however determined, which is generally applicable to gas being sold from the area in which the gas subject hereto is sold, which when adjusted for heating value, is higher than the then applicable price under Section 12.1 or Section 12.2[[1]] hereof, the price for gas sold hereunder shall be increased to equal such higher price effective on the date such price is prescribed or approved.
"This Section 12.3 shall not apply in event of decontrol by the Federal Power Commission of the wellhead price of gas."
The Federal Power Commission (hereinafter referred to as FPC)[2] regulates the sale of gas in interstate commerce. The contract with which we are here concerned involves intrastate sale of gas and is not subject to FPC regulations or control. The parties agree that the reference to FPC pricing in § 12.3 of the contract does not recognize authority of the FPC to officially fix the sale price of the gas to be sold under the contract, but is only a price setting gauge agreed upon by the parties.
The contract was entered into in June of 1975 with an effective date of April 9, 1975. At the time the contract was negotiated, the price fixed by it was in excess of the price set by the FPC for sale of gas from the area in interstate commerce; but, effective July 27, 1976, the price set by the FPC for such gas (hereinafter referred to as the July 27, 1976 Order) exceeded the price *465 otherwise set by the contract. The operation of § 12.3 of the contract was, thus, triggered.
There would not have been a dispute between the parties if the FPC order had set a single price without vintaging. However, it established a ceiling rate of 93¢/MCF (plus adjustments and annual increases) for gas from wells spudded between January 1, 1973 and January 1, 1975, and a ceiling rate of $1.42/MCF (plus adjustments and quarterly increases) for gas from wells spudded on or after January 1, 1975.[3] The gas presently being furnished under the contract was from wells spudded between January 1, 1973 and January 1, 1975.
Appellant contends that § 12.3 of the contract fixes $1.42/MCF as the price of the gas as a result of the FPC July 27, 1976 Order. Appellee contends that the section fixes 93¢/MCF as such price. Appellee has paid the lower price and this lawsuit was commenced by appellant to secure payment of the difference between the lower (93¢/MCF) and the higher ($1.42/MCF) price for gas already sold and to establish the higher price as that to be paid for gas sold in the future under § 12.3 of the contract  at least until the price is further changed thereunder.
The parties have stipulated to facts which are material to this case, including the fact that the FPC July 27, 1976 Order established the "ceiling prices generally applicable to the gas being sold from the area" in which the gas in controversy was sold.
Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. Fuchs v. Goe, 62 Wyo. 134, 163 P.2d 783 (1945); Shellhart v. Axford, Wyo., 485 P.2d 1031 (1971); Oregon Short Line Railroad Company v. Idaho Stockyards Company, 12 Utah 2d 205, 364 P.2d 826 (1961). If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract. Pilcher v. Hamm, Wyo., 351 P.2d 1041 (1960); Fuchs v. Goe, supra; Hollabaugh v. Kolbet, Wyo., 604 P.2d 1359 (1980); Wyoming Bank and Trust Company v. Waugh, Wyo., 606 P.2d 725 (1980). And the contract as a whole should be considered, with each part being read in light of all other parts. Shepard v. Top Hat Land & Cattle Co., Wyo., 560 P.2d 730 (1977); Rossi v. Percifield, Wyo., 527 P.2d 819 (1974); Shellhart v. Axford, supra; Quin Blair Enterprises, Inc. v. Julien Construction Company, Wyo., 597 P.2d 945 (1979). The interpretation and construction is done by the court as a matter of law. Hollabaugh v. Kolbet, supra; Bulis v. Wells, Wyo., 565 P.2d 487 (1977); Shepard v. Top Hat Land & Cattle Co., supra.
If the contract is ambiguous, resort may be had to extrinsic evidence. J.W. Denio Milling Co. v. Malin, 25 Wyo. 143, 165 P. 1113 (1917); Kilbourne-Park Corporation v. Buckingham, Wyo., 404 P.2d 244 (1965). An ambiguous contract "is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." Bulis v. Wells, supra, 565 P.2d at 490. Ambiguity justifying extraneous evidence is not generated by the subsequent disagreement of the parties concerning its meaning. Homestake-Sapin Partners v. United States, 10th Cir.1967, 375 F.2d 507.
Appellee contends this contract to be clear and unambiguous. The trial court so found, and appellant does not contend otherwise. Whether ambiguity exists is a question of law. Redding Foods, Inc. v. Berry, Tex.Civ.App., 361 S.W.2d 467 (1962); Bosler v. Coble, 14 Wyo. 423, 84 P. 895 (1906). We are, therefore, at liberty to make a determination as to the existence of ambiguity whether or not the parties here agree thereto one way or the other, and whether or not the trial court has reached a conclusion thereon one way or the other.
In any event, we agree that the intent of the parties was adequately expressed *466 in, and can be determined from, the language of the whole contract. Even if there be an ambiguous term or portion of the contract, extrinsic evidence is not considered if the meaning of the ambiguous term or portion of the contract can be ascertained from other language of the contract, i.e., from the contract as a whole. Quin Blair Enterprises, Inc. v. Julien Contruction Company, supra; In re Pirie's Estate, 116 Vt. 159, 71 A.2d 245 (1950); Ullman v. Chicago & N.W. Ry. Co., 112 Wis. 150, 88 N.W. 41 (1901).[4]
The intent of the parties as expressed in this contract is to increase the price paid for the gas sold under it in an amount to equal the highest ceiling price approved by the FPC as generally applicable to gas sold from the area. This conclusion results from practical application of all of the language used in the contract which pertains to setting of price for the gas. Consideration is given to contract language as follows:
1. An intention that there be a single price for all gas sold under the contract is manifested by the language of §§ 12.1 and 12.2. A "base price" of a specified amount is there set out. The contract covers sale of gas from additional wells not yet drilled into the "common source of supply," and the price for gas from such wells is set at the same amount as that from the existing wells per §§ 2.12, 2.2, 4.1, 5.7 and 7.1 of the contract. Vintaging with reference to these new wells was not intended. Yet vintaging would result as to them if the contract were construed as contended by appellee, and one price would be set for the new wells and another for the present wells  all contrary to the single price language of the contract.
2. An intention to set the price at the highest price authorized by the FPC without reference to vintaging exists in use of the words "prescribe or approve" in § 12.3 of the contract. Repeating pertinent portions of that section:
"12.3 If * * * the Federal Power Commission * * * shall * * * prescribe or approve a ceiling price or prices, however determined, which is generally applicable to gas being sold from the area * * * which * * * is higher than * * * [the price being paid under the contract], the price for gas sold hereunder shall be increased to equal such higher price effective on the date such price is prescribed or approved." (Bracketed material and emphasis supplied.)
Vintaging was prescribed by the July 27, 1976 Order. If "prescribe" was the only verb used by the parties, it might be easier said that vintaging prices were intended to apply to the gas sold under the contract. However, the verb "approve" was used in the contract as an alternate to "prescribe." The higher price ($1.42/MCF) was approved as a price of gas "generally applicable" to gas being sold from the area. Thus, the contract price is not restricted to that prescribed to be paid for the gas sold under the contract if it were sold in interstate commerce pursuant to the July 27, 1976 Order.
Appellee has argued that use of the words "generally applicable" negate the higher vintage price ($1.42/MCF) as being within the expressed intention of § 12.3 of the contract inasmuch as it was "generally applicable" only to gas from wells spudded after January 1, 1975, and the other vintage prices must be considered in arriving at the price "generally applicable" to all gas sold in the area. This argument would have some attraction, but the parties specifically stipulated that the July 27, 1976 Order "established ceiling prices generally applicable to the gas being sold from the area." Thus, the highest vintage price ($1.42/MCF) was one of the prices agreed to be "generally applicable." And it was "approved" as a "ceiling price" to be used in setting the price of gas sold under the contract.
3. To reach the interpretation contended for by appellee, i.e., the only purpose of § 12.3 was to insure that appellant was not *467 prohibited by the contract from selling gas at a higher price in interstate commerce, would require the court, in effect, to insert words "as if it were sold in interstate commerce," or "as if it were subject to the FPC" into the contract.[5] If we were to agree with this contention we would be rewriting the contract for the parties under the guise of construction. This, we cannot do.
"It is a fundamental principle that a court may not make a new contract for the parties or rewrite their contract under the guise of construction. * * *" 17 Am.Jur.2d Contracts § 242 (1964). Quin Blair Enterprises, Inc. v. Julien Construction Company, supra, 597 P.2d 945.
In reaching its decision, the trial court referred to C.F. Braun & Co. v. Oklahoma Gas & Electric Co., 10th Cir.1979, 603 F.2d 132, as "persuasive authority" which "comes much closer to being on all-fours with the fact situation of our instant case"; but the contract before the court in the Braun case specifically included the language missing from the contract in this case which set forth the intention of the parties to apply vintaging in determining the escalated price. The pertinent clause of the contract in the Braun case read:
"In the event the Federal Power Commission, in the exercise of its authority to regulate the wellhead price of natural gas, shall, at any time during the term hereof, establish an area price (hereinafter referred to as the `area price') which would be applicable to gas covered by this contract if the same were subject to the authority of said commission which area price is higher than the price provided for by the terms of this contract effective upon the date of said area price, then the price to be paid for gas purchased under this contract thereafter shall be one-half cent (1/2¢) higher than the area price in lieu of that provided for herein." (Emphasis supplied.) 603 F.2d at 132-133.
The court there held that the clause reflected the intention to apply vintaging to the price escalation provision. We would do likewise if the emphasized words were in the contract before us. Such words reflect that the price would be fixed as if the gas "were subject to the authority of said commission." To reach the same conclusion in this case, we would have to supply those words or similar words. Such would amount to rewriting of the contract for the parties, and, as indicated, we will not do so. We must conclude that the parties would have inserted such words in the contract if they intended the sale of gas to be subject to vintaging.
4. The contract reflects the intention of the parties to avoid FPC control. In Article XX of the contract, titled "Regulation," § 20.2 reads:
"20.2 Buyer agrees that all of the gas purchased hereunder will be transported and consumed solely within the State of Wyoming and will not be commingled in Buyer's pipeline with any other gas which is not solely transported and consumed in the State of Wyoming."
Of course, it is common knowledge that gas and oil producers and purchasers have many reasons other than price regulation to avoid FPC control, and § 20.2 of the contract mandates that which is necessary to avoid such control. The reference to FPC ceiling prices in § 12.3 is recognized by both parties as only a reference gauge for use in setting a ceiling price for the gas sold under the contract, not an acquiescence to FPC regulation or control. Yet, vintaging is a form of control utilized by the FPC, and application of it to the contract price can be said to be contrary to the overall intention of the parties as expressed in the contract to avoid such control.
5. The parties have urged controlling importance of other specific words in § 12.3 of the contract, such as "price or prices," to indicate an expectation of dual price settings;[6] "however determined" to reflect intention *468 to exclude application of vintaging, or, conversely, to refer only to the form used by the FPC in establishing the price; "higher" as being a comparative and not a superlative word, thus reflecting intention to apply other than the highest vintage price. We do not find any of these specific words to be controlling in reflecting an expressed intention of the parties.
In the final analysis, we look at all of the foregoing to conclude that the intention of the parties, as expressed in the contract, was to escalate the price of the gas sold under the contract to equal that "approved" by the FPC as a ceiling "generally applicable" to gas being sold from the area. The parties have stipulated that the July 27, 1976 Order "established ceiling prices." One dollar and forty-two cents ($1.42/MCF) was one of these prices. Further, the intention was manifested to apply § 12.3 in the manner usual to a favored nations clause, i.e., to escalate the price to the highest price being paid, or contracted to be paid, to another seller.
Favored nations clauses are a common feature of gas purchase and sale contracts. The nature of the product and its questionable availability engenders reluctance on the part of producers to enter into long term contracts at the price prevailing at the time of contract. Yet purchasers require long term commitments to insure an adequate supply of gas. A two-party favored nations clause provides an increase in price to match any higher price which the purchaser pays to any other seller. A third-party favored nations clause requires the purchase to match any higher price contracted to be paid by any other buyer in the same field or area.[7] 4 Williams Oil and Gas Law § 726 (1977). Favored nations clauses are recognized by the courts. Superior Oil Company v. Western Slope Gas Company, 10th Cir.1979, 604 F.2d 1281;[8]Holly Sugar Corporation v. Fritzler, 42 Wyo. 446, 296 P. 206 (1931); Texas Gas Transmission Corporation v. Shell Oil Company, 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960).
Section 12.3 of the contract is a form of a third-party favored nations clause. The principal objective of such clauses is to escalate the agreed price to equal the highest price being paid for the commodity by any other purchaser. The intention of appellant and appellee as expressed in the contract was to give appellant the benefit of any price prescribed or "approved" by the FPC for gas being sold from the area. There is no indication that they intended to apply vintaging to any increase triggered by § 12.3 of the contract.
Reversed and remanded with direction to enter a summary judgment in favor of appellant-plaintiff in accordance with the foregoing and pursuant to the prayer in the amended complaint.
NOTES
[1] Section 12.1 establishes the base rate to be paid for gas at 75¢/MCF. (MCF means 1,000 cubic feet of gas at a pressure of 14.65 pounds per square inch gauge and at a temperature of 60 degrees Fahrenheit.) Section 12.2 provides that the price was to be determined at two year intervals on the basis of the prices being paid by purchasers to gas producers in the area.
[2] The Federal Energy Regulatory Commission is now successor to the Federal Power Commission.
[3] This concept, whereby the price which the producer is allowed to recover for his gas is based on the age of the well, is referred to as "vintaging."
[4] Each party points to some extrinsic matters, such as contracts with other parties, other contracts between these parties, negotiation history of this contract, et cetera.
[5] Other contracts referred to by the parties contain similar wording.
[6] A more accurate construction of the words "price or prices" is that such contemplates tandem increases. Appellant would thus receive the benefit of an increase in ceiling price by FPC whenever that occurred and each time if it occurred more than once. The intention of the parties as expressed by their contract was to secure to appellant the advantage of the highest price to be paid for gas being sold in interstate commerce.
[7] The term "favored nations clause" is derived from international law where it is used to refer to trade agreements or treaties providing for the extension of terms by one party to the other which are as favorable as the terms extended to the most favored nation with which it may deal.
[8] In Superior Oil Company v. Western Slope Gas Company, supra, the Tenth Circuit Court reversed the District Court for the District of Colorado which held vintaging applied to an escalation clause in an intrastate contract. The Tenth Circuit held that the phrase "other conditions of sale" did not include vintaging established by the FPC for interstate sales in a two-party favored nations clause which reads in pertinent part:

"If, at any time * * * Buyer pays to a producer of natural gas * * * a price per MCF higher than that being paid to Seller hereunder, due consideration being given to the quality of the gas, bases of measurement, delivery pressure, and other conditions of sale, Buyer shall, * * * increase the price being paid to Seller hereunder to equal such higher prices.... [Emphasis supplied.]" 604 F.2d at 1282.
The Tenth Circuit Court found the price to be set at the highest vintage price being paid by buyer even though the gas from seller's wells would have been sold at a lower vintage price in interstate commerce.