Austin J. McGREAL, Appellant (Plaintiff),

v.

JACKIE FINE ARTS, INC., Appellee (Defendant).

Ronald A. REED, Appellant (Plaintiff),

v.

JACKIE FINE ARTS, INC., Appellee (Defendant).

Nos. 5700, 5701.

Supreme Court of Wyoming.

Dec. 3, 1982.

**150**

Richard V. Gose, Casper, for appellants.

David B. Park, Casper, for appellee.

Before ROSE, C.J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

ROONEY, Justice.

Appellants-plaintiffs, Austin J. McGreal and Ronald A. Reed, filed separate actions against appellee-defendant, Jackie Fine Arts, Inc., alleging breach of contract and seeking the refund of monies paid appellee for the purchase of art masters[1], related copyrights, and the printing of a limited edition[2] from the masters. Appellee counterclaimed seeking foreclosure on the liens on the masters and personal deficiency judgments against appellants.

After a trial to the court of Reed's case, the parties stipulated that the facts there presented were identical in all material respects to the facts to be presented in McGreal's case and that the judgment in Reed would be dispositive of McGreal's case. The judgment entered by the trial court dismissed appellants' complaints, dismissed appellee's counterclaims for deficiency judgments, and ordered appellants to transfer all right and title to the masters to appellee.

On appeal appellants contend that the trial court erred in finding: (1) that appellee did not breach the contracts by failing to deliver the art masters in a timely manner or by failing to perform relative to tax benefits, and (2) that appellee was entitled to the assignment of appellants' right, title and interest in the art masters.

We affirm.

In late 1978, appellants were introduced to appellee's program of marketing art masters as a tax shelter. Appellants attended a seminar at which the appellee's program and the potential tax benefits of the purchase of an art master were explained. On December 30, 1978, each appellant entered into a contract with appellee for the purchase of an art master and each claimed certain tax benefits on his 1978 federal income tax return as a result thereof.

At the time they entered into the contracts, appellants received a "Bill of Sale" for the art masters and an "Assignment of Copyright and Model and Property Release" for the art masters. In 1979, appellants also received letters from appellee notifying them that the testing of the masters had been completed on December 31, 1978, and that the masters were ready and available for the production of the limited editions. However, the art masters were not delivered into the actual possession of the appellants.

In July of 1979, appellants were audited by the Internal Revenue Service and asked to substantiate the depreciation, investment tax credit, etc., claimed as a result of the transaction. After consulting with their accountants, appellants withdrew the questioned claims because they believed they could not provide the requested substantiation. Appellants then notified appellee of their intention to cancel the contracts and requested the return of the amounts paid on them. When appellee failed to return the amounts paid, appellants brought the actions from which these appeals resulted.

## BREACH OF CONTRACT

Appellants contend that a delivery of the art masters to appellants in 1978 was of

1. Paragraph 1.1 of the Purchase Agreement defines "master" as follows:

   "1.1 'Master' means a photoscreen negative, plate, stone, block, Mylar, transparency, screen, metal or other material from which prints can be made."

2. Paragraph 1.6 of the Purchase Agreement defines "limited edition" as follows:

   "1.6 'Limited Edition' means original prints produced by or under the supervision of the Artist which are numbered and signed by the Artist."

critical importance to them with reference to the tax benefits claimed by them in that year. The potential for tax savings was one of the major selling points used by appellee in marketing the program. Appellants contend that actual delivery of the art masters in 1978 was required by the contracts. Appellee contends that only constructive delivery, i.e., delivery to the printer, was required and that such delivery was made.

We have often set forth the standard by which contracts are examined on appeal:

"Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. [Citations.] If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract. [Citations.] And the contract as a whole should be considered, with each part being read in light of all other parts. [Citations.] The interpretation and construction is done by the court as a matter of law. [Citations.]

"If the contract is ambiguous, resort may be had to extrinsic evidence. [Citations.] An ambiguous contract 'is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present.' [Citation.] Ambiguity justifying extraneous evidence is not generated by the subsequent disagreement of the parties concerning its meaning. [Citation.]" *Amoco Production Company v. Stauffer Chemical Company of Wyoming,* Wyo., 612 P.2d 463, 465 (1980).

Paragraph 3.4 of the contracts provides: "Seller shall deliver each Master to Purchaser, or to a distributor designated by Purchaser, at the expense of purchaser, not later than the delivery date set forth in Schedule A."

There is no "delivery" date, as such, on Schedule A. The only date on it is "12–30–78," inserted on the upper right hand corner. It could be the date of execution, or it could be the date referred to in paragraph 3.4 of the contracts. This potential ambiguity makes it necessary to examine extrinsic evidence in order to determine the intention of the parties with reference to whether or not the delivery of the art master to appellants was to be done constructively or actually.

Paragraph 8.4 of the contracts provides: "8.4 The Purchaser and/or his Advisor has carefully read the Information Memorandum and all exhibits thereto which discuss the nature of the business activities to be conducted by the Purchaser and the elements of risk associated therewith and fully understands their content."

The referred to information memoranda or offers are detailed. They provide in part:

"Within 15 days after the closing, the Master Artwork will be delivered by the Seller to a printer for the production of the Limited Edition; thereafter, the Master Artwork and the prints will be delivered to the Purchaser or at his direction to a Distributor or gallery. * * * "

The evidence reflected that the art master would be used by the printer and artist for an indefinite period of time in order to produce the prints. To make prints from the art master, the printer or chromist had to transfer the lines and colors from the art master to the prints. Refinements are made in the product by the artist until he is satisfied that the resulting prints accurately depict the original art work. Only then are the prints made and signed by the artist. They are made in the limited number agreed upon, and they are delivered to appellants for marketing. Appellants' profits are to result from the sale of the prints.

■ In these cases, the printing was completed in late 1979. The contemplated process made it impossible to effect actual delivery on December 30, 1978, the date the contracts were entered into and the date contained on Schedule A. Accordingly, appellee did not breach the contracts for failure to deliver the art masters on the date contained in Schedule A as required by paragraph 3.4, supra, of the contracts. They were in the hands of the printers on December 31, 1978. The delivery was constructive delivery to appellants.

■ If the date on Schedule A was the date of execution of the contracts and not the delivery date referred to in paragraph 3.4, and if actual deliveries were contemplated, the deliveries were made in a reasonable time and did not constitute a breach of the contracts. When the time for performance is not set out in a contract, a reasonable time is implied. *Zitterkopf v. Roussalis,* Wyo., 546 P.2d 436 (1976); § 34–21–226, W.S.1977; *Singer Company v. Makad, Inc.,* 213 Kan. 725, 518 P.2d 493 (1974).

■ It can be inferred from appellants' argument that their basic complaint is their failure to obtain the 1978 tax benefits which they contend were a major part of the contracts' consideration. Such benefits were emphasized by appellee in selling the program. The information memoranda or offers referred to in the contracts, the contents of which appellants acknowledged to have read and understood (see paragraph 8.4, quoted supra), devotes nine pages to "Federal Income Tax Consequences." Its Appendix A is a nineteen-page opinion letter from a Los Angeles law firm.

However, the information contained in the contracts and in the information memoranda did not insure appellants against tax questions arising from an audit. In addition to appellants' representations, warranties, and covenants contained in paragraph 8.4 of the contracts, supra, they represented, warranted, and covenanted as follows:

"8.2 The Purchaser and/or his Advisor has had the opportunity to ask questions of, and receive answers from, representatives of Seller concerning this transaction and to obtain any additional information which Seller possesses or can acquire without unreasonable effort or expense, necessary to verify the information contained in the Memorandum;

"8.3 The Purchaser and/or his Advisor has such knowledge and experience in financial and business matters and investments that he is capable of evaluating the merits and risks of the purchase of the Master and has obtained, in the Purchaser's judgment, sufficient information from Seller relating to the purchase of

the Master to enable him and/or his Advisor to evaluate all the merits and risks of such purchase.

\* \* \* \* \* \*

"8.5 The Purchaser acknowledges that whatever Federal income tax benefits he anticipates in connection with the purchase of a Master may not be available as a result of the adoption of new laws, amendments to existing laws or regulations or changes in the interpretation of existing laws or regulations."

Appellant Reed testified on behalf of appellants as follows with reference to the difficulties with the Internal Revenue Service:

"Q. Did you understand that Jackie Fine Arts would provide both legal and accounting assistance in the event of a challenge with the Internal Revenue Service?

"A. I think that was—Yes, that was held out.

"Q. Did you request that type of assistance?

"A. No, I didn't."

He testified that the questioned tax claims were not disallowed by the Internal Revenue Service but were withdrawn when questioned.

To accept appellants' contention that the tax benefits were insured by appellee as part of the contracts would be to rewrite the contracts to include such guarantee.

"It is one thing to interpret a contract or to discern the contractual intent of the parties pursuant to established legal rules, but it is another thing to make a contract for the parties. We are obliged to do the former, and we are prohibited from doing the latter.

" 'Courts may not rewrite contracts under the guise of interpretation. \* \* \* ' *Quin Blair Enterprises, Inc. v. Julien Construction Company,* supra, [Wyo.,] 597 P.2d [945] at 951 (1979)." *McCartney v. Malm,* Wyo., 627 P.2d 1014, 1020 (1981).

Even if such guarantee were in the contracts, the tax benefits were not shown to be unavailable to appellants, and appellants did not reasonably pursue them.

## ASSIGNMENT

The trial court ordered the appellants to assign their right, title and interest in the art masters to appellee as was requested in appellee's counterclaim. Appellants base their claim of error in this order on the fact that appellee, a foreign corporation, did not have a certificate of authority to do business in the State of Wyoming.[3]

We need not consider the merits of this issue inasmuch as appellants abandoned the foundation for it during the trial, and the trial court found that they had stipulated to a reversion to appellee of the right, title and interest in the art masters. During the trial, appellants' counsel advised the court:

" * * * the plaintiff does not lay any claim at all to that master. We don't even know where it is and we don't care about it. We don't really care about any kind of possession or ownership of it. We are not going to contest that.

" * * * we don't care where the master is. We are not going to lay a claim to it."

■ The appellants are bound thereby, and they cannot predicate error on a judgment or order made in conformance with it. *Nichols v. Pangarova,* Wyo., 443 P.2d 756 (1968).

Affirmed.

THOMAS, Justice, specially concurring.

I am in complete accord with the majority of the court with respect to the result of affirmance in these cases. I do not find ambiguity existing with respect to whether the parties intended constructive or actual delivery, however. A contract may be classified as ambiguous when indefiniteness is present as well as when a double meaning can be found. *Amoco Production Company v. Stauffer Chemical Company of Wyoming,* Wyo., 612 P.2d 463 (1980); *Meuse-Rhine-Ijssel Cattle Breeders of Canada Ltd. v. Y–Tex Corporation,* Wyo., 590 P.2d 1306 (1979); *Bulis v. Wells,* Wyo., 565 P.2d 487

(1977). This contract was indefinite because in Schedule A it did not provide for a delivery date.

Therefore, I would deal with the claim of breach for failure to deliver the masters by concluding that the Purchase Agreement and Schedule A simply are silent with respect to a delivery date. Initial consideration must be given to § 3.4 of the Purchase Agreement, which provides as follows:

"Seller shall deliver each Master to Purchaser, or to a distributor designated by Purchaser, at the expense of purchaser, not later than the delivery date set forth in Schedule A."

Schedule A has a date notation at the top of "12–30–78," but that date is consistent with the execution and closing, and the circumstances made delivery on that date physically impossible. The parties simply failed to provide for a delivery date. Our function then is to discern the intent of the parties by resorting to extrinsic evidence. *Strang Telecasting, Inc. v. Ernst,* Wyo., 610 P.2d 1011 (1980); *Mauch v. Ballou,* Wyo., 499 P.2d 591 (1972). In determining the intention of the parties, the court can and should look to associated documents, including a document entitled "Jackie Fine Arts, Inc., Information Memorandum For the Purchase of Master Artworks." A part of that document states as follows:

"Delivery of the Master Artwork

"Within 15 days *after the closing,* the Master Artwork will be delivered by the Seller to a printer for the production of the Limited Edition; thereafter, the Master Artwork and the prints will be delivered to the Purchaser or at his direction to a Distributor or gallery. The Purchaser will be required to pay approximately $3,000 at the closing to cover the cost of producing the Limited Edition." (Emphasis added.)

There was information in the record from which the trial court could conclude that in each instance the master artwork was deliv-

---

**3.** Section 17–1–719(a), W.S.1977, provides in part:

"(a) No foreign corporation transacting business in this state without a certificate of authority shall be permitted to maintain any action, suit or proceeding in any court of this state, until such corporation shall have obtained a certificate of authority. * * *"

ered to a printer within 15 days after closing, and it follows that there was no breach of the contract because of any failure to deliver the masters. I agree with the majority opinion that the rule of reasonable time then should be invoked with respect to the delivery of the prints, and given the rather complicated production process I am satisfied that a reasonable time had not expired when the appellants decided to repudiate the contract and claim breach by the appellee.