Louis W. CARLSON; Lora M. Carlson; Edwin Egge; Janieve Egge; Donnie Patton; and Elizabeth Patton, Appellants (Plaintiffs),

v.

WATER UNLIMITED, INC., a Wyoming Corporation, Appellee (Defendant).

WATER UNLIMITED, INC., a Wyoming Corporation, Appellant (Defendant),

v.

Louis W. CARLSON; Lora M. Carlson; Edwin Egge; Janieve Egge; Donnie Patton; and Elizabeth Patton, Appellees (Plaintiffs).

Nos. 90–216, 90–217.

Supreme Court of Wyoming.

Dec. 30, 1991.

Peter K. Michael of Lathrop, Rutledge & Michael, P.C., Cheyenne, for appellants in No. 90–216 and appellees in No. 90–217.

Donald B. Hansen of Hansen & Peck, Newcastle, for appellee in No. 90–216 and appellant in No. 90–217.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

GOLDEN, Justice.

An appeal and a cross-appeal are taken from a judgment in a declaratory judgment action in which the trial court was called upon to declare the parties' rights and duties under a water right agreement dated August 15, 1977.

The action was filed by Mr. and Mrs. Louis W. Carlson, Mr. and Mrs. Edwin Egge, and Mr. and Mrs. Donnie Patton, each of whom own certain parcels of property which on August 15, 1977, comprised the Mountain View Trailer Court owned only by Carlsons. Water Unlimited, Inc. (W.U.), a Wyoming corporation, owns Carlson well No. 1, which is the source of the water right referred to in the agreement in question. In the action, W.U. filed a counterclaim seeking payment for the water furnished the Egges and the Pattons since they each became owners of their respective parcels of property.

The Carlsons, Egges, and Pattons asserted that the water right agreement was unambiguous and prevented W.U. from imposing any water line maintenance fee on the Egges and Pattons until such time as the Carlsons were no longer the owners of any parcel of the property that once comprised the Mountain View Trailer Court. Disputing that assertion, W.U. claimed that the water right agreement was ambiguous. Additionally, W.U. claimed that extrinsic evidence showed the parties to the agreement intended it to mean that once the Carlsons sold to any third party any part of the property comprising the Mountain View Trailer Court, then W.U. could charge the third party a water line maintenance fee based upon the amount of water consumed by the third party.

The trial court found that the water right agreement was ambiguous, took extrinsic evidence, and found in favor of W.U. Because of proof problems on the counterclaim, the trial court directed the parties to determine a price for the water consumed or, failing in that effort, to return for a hearing on that issue. The Carlsons, Egges, and Pattons appeal from that judgment. W.U. appeals from that part of the judgment directing the parties to determine a price or return for a hearing, claiming that it proved its monetary entitlement at trial.

We reverse the trial court's judgment since our holding is in favor of the Carlsons, Egges and Pattons and their construction of the water right agreement. We remand with direction to enter judgment in their favor in accordance with this opinion.

## FACTS

In 1954, Mr. and Mrs. Carlson owned the Mountain View Trailer Court property (hereinafter called original property) described as follows:

Lots 10 through 15, in Block 9, and Lots 1 through 10, in Block 10 of Duff Grey Addition, and Lot 1 in Block 17, and Lots 1, 2 and 3, in Block 18 of Washington Park Addition, in the City of Newcastle, Weston County, Wyoming.

On this property they built a brick home and established two trailer courts, one designated as Mountain View Trailer Court and called part A of the original property, and the other designated as Carlson Court and called part B of the original property.

From 1954 until 1962, the Carlsons obtained water for their home and trailer court tenants from the City of Newcastle. In April 1962, they drilled and completed an artesian well, identified as Carlson No. 1, that produces a flow of 1,500 gallons per minute. They constructed a pipeline to serve their property and discontinued the city water service.

In 1966, the Carlsons, Mr. and Mrs. Warren Voss, and Forest E. Ryder formed Water Unlimited, Inc. As shareholders, the Carlsons owned forty percent, the Vosses fifty percent, and Ryder ten percent. The purpose of the corporation was to market Carlson No. 1 water.

At a shareholders meeting on May 24, 1970, they resolved that water rights be granted to lands owned by the Vosses and to "Mountain View Trailer Park and all land adjacent thereto owned by" the Carlsons. There was to be no charge for the water rights until the landowners "should sell their interest in the above lands to third parties." In that event, a line maintenance fee of "15¢ per 1000 gallons used" would be charged, that charge to be adjusted annually. At buyer's expense, a meter was to be installed at the time of sale.

In the summer of 1977, the Carlsons negotiated with Peter Field for the purchase of their stock in Water Unlimited, Inc. On August 9, 1977, at a special shareholders meeting, the sale of Carlsons' stock to Field was approved. On August 15, 1977, the water right agreement, the interpretation of which is at issue, was executed by the Carlsons and W.U. See Appendix A of this opinion.

In December, 1977, the Carlsons sold their brick house to Mrs. Egge. In February, 1978, the Carlsons also sold to Mrs. Egge part A of the original property. In January, 1988, the Egges sold to the Pattons (Mr. Patton is Mrs. Egge's son) an interest in a portion of part A of the original property. Mr. Patton then took over management of the trailer court on part A. Thus, the Carlsons still own and live at part B (Carlson Court) of the original property, the Egges own and live in the brick house located on the original property and with the Pattons own an interest in part A of the original property.

In May, 1989, W.U. made demand on the Egges for $13,600 for water supplied to them since 1977. In June, 1989, W.U. notified the Egges that in August it would begin charging them for water usage at the rate of $8 per trailer per month. The Egges next received water useage bills covering the months of September and October, 1989, in the amounts of $240 and $248, respectively.

Meanwhile, on September 19, 1989, the Carlsons, Egges, and Pattons filed their declaratory judgment action against W.U. seeking a declaration of the meaning of the water right agreement. W.U. filed its counterclaim on October 26, 1989. On April 5, 1990, in denying a motion for summary judgment filed by the Carlsons, Egges, and Pattons, the trial court held that the water right agreement was ambiguous. The parties tried the case on July 5, 1990, and, on July 19, 1990, the trial court entered its judgment. These appeals followed.

## DISCUSSION

The Carlson group contends the water right agreement is unambiguous and, as applied to the dispute between the parties, means that W.U. cannot impose a line maintenance charge on the Egges and Pattons until the Carlsons or their heirs no longer own any parcel of the original property. The trial court disagreed, as did W.U., and construed the agreement, with the aid of extrinsic evidence, to allow W.U. to impose the line maintenance charge on

the Egges and the Pattons from the dates on which they acquired their respective interests in the parcels of the original property.

This court has said,

[w]hether ambiguity exists is a question of law. We are, therefore, at liberty to make a determination as to the existence of ambiguity whether or not the parties here agree thereto one way or the other, and whether or not the trial court has reached a conclusion thereon one way or the other.

*Amoco Production v. Stauffer Chemical Co. of Wyoming,* 612 P.2d 463, 465 (Wyo. 1980) (citations omitted). In determining whether an ambiguity exists, we apply those well-established principles set forth in numerous Wyoming decisions and nicely summarized in *Amoco:*

Our basic purpose in construing or interpreting a contract is to determine the intention and understanding of the parties. If the contract is in writing and the language is clear and unambiguous, the intention is to be secured from the words of the contract. And the contract as a whole should be considered, with each part being read in light of all other parts. The interpretation and construction is done by the court as a matter of law.

If the contract is ambiguous, resort may be had to extrinsic evidence. An ambiguous contract "is an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." Ambiguity justifying extraneous evidence is not generated by the subsequent disagreement of the parties concerning its meaning.

*Amoco,* 612 P.2d at 465 (citations omitted).

The water right agreement, provides, in pertinent part:

• W.U. will deliver well water of Carlsons "in such quantities as [they] may use, need or desire in the area known as Mountain View Trailer park owned by [them] which land * * * is described as follows * * *."

• The description was of the total property on which was located the brick home and the two trailer courts (part A and part B). The water will be delivered to Carlsons "at no charge so long as either [Mr.] Carlson or [Mrs.] Carlson, or their heirs, are the owners of the land described [above]."

• "[A]t such time as [the Carlsons], or the survivor of them, or their heirs, shall sell all of their right, title and interest in the land described [above] to any third party, then the water right established by this agreement shall continue in favor of such third party * * * provided however, that from the date of such sale [W.U.] shall have the right to charge the then owner a line maintenance charge * * * of fifteen cents * * * per 1000 gallons of water used and delivered [to be adjusted annually] * * *. [T]he purchaser of this water right at the time of sale shall be required to install a meter [at purchaser's expense] * * *."

• The delivery point for Carlson water is the Boyd Street valve box on the east side of the Carlson property. From that delivery point to all points within the boundaries of the total property "to which this water right has been established[,]" "[Carlsons] shall be responsible for the construction, repair and maintenance of all water lines, connections and appurtenances for the use and distribution of water * * *."

• From the well to Carlsons' delivery point, W.U. shall be responsible for the "repair, maintenance [or] replacement of the water line * * *."

• "[A]s to any repair or maintenance or replacement need which may occur at any point on the line between the south side of U.S. Highway 16 and [Carlsons' delivery point] * * *[,] during the time that [Carlsons] or their heirs shall remain the owner of the water right hereby established, * * * [W.U.] will provide all of the parts and materials necessary for any repair or replacement and [Carlsons] or their heirs will provide all of the labor and equipment required to make any line repair or replacement * * *."

• When the Carlsons or their heirs sell the water right, "[W.U.] shall be respon-

sible for all of the cost of such repair, maintenance or replacement of [the water line from the well up to [Carlsons] delivery point] * * *."

• Carlsons "will not deliver or sell any water * * * for use outside of [the total property] * * * however, * * * [they] may and will supply water in any manner [they] deem proper to any person, firm or corporation within [the total property] to which this water right has been established."

• "[T]he water right granted to [Carlsons] under this agreement shall become an obligation and burden on the [property on which Carlson No. 1 is located]."

• "[If] [W.U.] should sell * * * any or all of the water wells located on [that] property * * * it must sell such well or wells subect [sic] to such burden and obligation * * *."

Applying our contract construction principles to the water right agreement, we hold that the agreement is unambiguous and that the parties' intent was adequately expressed in, and can be determined from, the language of the whole agreement.

The intent of the parties as expressed in this agreement is to tie inextricably together the Carlsons' water right established by the agreement and Carlsons' line maintenance responsibility. As long as the Carlsons own any part of the original property, they have line maintenance responsibility as provided in the agreement. As long as the Carlsons have that responsibility W.U. shall not impose a line maintenance charge. When the Carlsons no longer own any part of the original property, they no longer have line maintenance responsibility; that responsibility passes to W.U. At that time, W.U. is allowed to impose a line maintenance charge upon the Carlsons' successors in title at the rate as provided in the agreement. Those successors in title will own Carlsons' water right established by the agreement, but they will have no line maintenance responsibility as that passed totally to W.U. upon Carlsons' selling the last part of the original property they owned. Under those circumstances, it is only fair and right that W.U. be allowed to

impose the charge and Carlsons' successors in title be required to pay the charge.

Since the Carlsons still own part B of the original property and have line maintenance responsibility under the agreement, W.U. is not allowed to impose a line maintenance charge on the Egges and the Pattons.

For this reason, W.U.'s counterclaim fails; the trial court's judgment in favor of W.U. on that counterclaim is reversed. We reverse and remand with direction to enter judgment in favor of the Carlsons, Egges, and Pattons in accordance with this opinion.

## APPENDIX A

### AGREEMENT

THIS AGREEMENT made and entered into on the 15th day of August, 1977, by and between WATER UNLIMITED, INC., a Wyoming corporation, whose mailing address is 3 Seminoe Avenue, Newcastle, Wyoming 82701, hereinafter referred to as WATER UNLIMITED and LOUIS W. CARLSON and LORA M. CARLSON, husband and wife, whose mailing address is 1103 South Summit Avenue, Newcastle, Wyoming 82701, hereinafter referred to as CARLSON:

### WITNESSETH:

WHEREAS, Water Unlimited is the owner of a water well known as Carlson Well no. 1 situated on the following described property, to-wit:

Township 45 north, range 61 west of the 6th P.M.

Section 28 NW¼NE¼

and Water Unlimited may drill additional wells on this property; and

WHEREAS, Carlson was one of the original incorporators of Water Unlimited and at present both Louis W. Carlson and Lora M. Carlson own stock in said corporation; and

WHEREAS, the corporation took official action at a meeting of the shareholders held on May 24, 1970 to grant a water right in favor of the property described as the

Mountain View Trailer Park in the City of Newcastle, Wyoming, owned by Carlson;

NOW, THEREFORE, in consideration of the premises and of the mutual promises and covenants of the parties herein contained, it is agreed as follows:

1. Water Unlimited will deliver water from the Carlson Well No. 1 or any other wells drilled on the hereinabove described property to Carlson in such quantities as Carlson may use, need or desire in the area known as Mountain View Trailer Park owned by Carlson which land is situated within the City of Newcastle, Wyoming, and is described as follows:

Lots 10 through 15, in Block 9 and lots 1 through 10, in Block 10 of Duff Grey Addition and Lot 1, in Block 17 and Lots 1, 2 nd 3, in Block 18 of Washington Park addition, in the City of Newcastle, Weston County, Wyoming.

However, it is understood that Water Unlimited does not guarantee any particular line pressure.

2. Water Unlimited will deliver such water to Carlson at no charge so long as either Louis W. Carlson or Lora M. Carlson or their heirs, are the owners of the land described in paragraph one above.

3. It is agreed that at such time Louis W. Carlson and Lora M. Carlson, or the survivor of them, or their heirs, shall sell all of their right, title and interest in the land described in paragraph 1 above to any third party, then the water right established by this agreement shall continue in favor of such third party from the date of such sale or transfer, provided however, that from the date of such sale Water Unlimited shall have the right to charge the then owner a line maintenance charge in the amount of fifteen cents ($.15) per 1000 gallons of water used and delivered, with the further understanding that such line charge may be adjusted annually, either upwards or downwards, by Water Unlimited in accordance with the cost of living index arrived at by the United States government on June 1 of each year compared to the cost of living index on the date of this contract. It is understood and will be required that the purchaser of this water right at the time of sale shall be required to install a meter at a point to be designated by Water Unlimited and the cost of the meter and of its installation shall be borne by said purchaser.

4. This agreement shall be effective from and after May 24, 1970.

5. It is understood and agreed that the point of delivery at which Carlson shall receive water from Water Unlimited will be the valve box at Boyd Street on the east side of the Carlson property. Carlson shall be responsible for the construction, repair and maintenance of all water lines, connections and appurtenances for the use and distribution of water from the point of delivery to all points within the boundaries of the land described in paragraph 1 above to which this water right has been established.

6. Water Unlimited shall be responsible for the repair, maintenance of replacement of the water line from the well up to the point of delivery to Carlson as defined in this agreement, and Water Unlimited agrees to maintain its line in a good state of repair so that there will be no unnecessary interruption of service or delivery of water to Carlson. Provided, however, during the time that Carlson or their heirs shall remain the owner of the water right hereby established, it is agreed that Water Unlimited will provide all of the parts and materials necessary for any repair or replacement and Carlson or their heirs will provide all of the labor and equipment required to make any line repair or replacement as to any repair or maintenance or replacement need which may occur at any point on the line between the south side of the U.S. Highway 16 and the point of delivery to Carlson as defined in this agreement. From and after the date of sale of the water right by Carlson or their heirs, Water Unlimited shall be responsible for all of the cost of such repair, maintenance or replacement of said water line as herein provided.

7. Upon notice to Water Unlimited that a break or leak exists in the line to be maintained by Water Unlimited, Water Un-

limited shall proceed forthwith to make the necessary repairs to said line so as to prevent any interruption of service or the delivery of water to Carlson. In the event Water Unlimited does not repair said line within 12 hours from the time of notice, Carlson shall be authorized to enter upon the property and to make any necessary repairs to said line or to contract with other persons or firms for the repair of such line, and all of the costs and expenses incurred by Carlson in making such repairs shall be the obligation and responsibility of Water Unlimited and shall be paid by Water Unlimited to Carlson within ten days after submission to it of a proper invoice.

8. Carlson agrees that he will not deliver or sell any water to any person, firm or corporation for use outside of the land described in paragraph 1 above. It is understood, however, that Carlson may and will supply water in any manner he deems proper to any person, firm or corporation within the land designated in paragraph 1 above to which water right has been established.

9. This agreement and the water right hereby granted is subject to force majeure and if the delivery of water to Carlson under this agreement is prevented or interrupted by any cause of force majeure, then the operation of this contract shall be suspended without penalty to either party during the term of such interruption.

10. It is understood that the water right granted to Carlson under this agreement shall become an obligation and burden on the following described real property situated in Weston County, Wyoming, to-wit:

Township 45 North, Range 61 West of the 6th P.M.
Section 28: NW¼NE¼

and on any and all water wells located on said land, and it is further agreed that in the event Water Unlimited should sell, transfer or convey any or all of the water wells located on the property described in this paragraph, which property has hereby been made subject to the burden and obligation of the water right created under this agreement in favor of the land owned by Carlson, it must sell such well or wells

sub[j]ect to such burden and obligation, and all of the obligations and burdens of this agreement must be assumed by any such purchaser.

11. This agreement shall be binding and inure to the benefit of the heirs, representatives, successors and assigns of the respective parties hereto.

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals to this agreement on the date above written.

WATER UNLIMITED
by /s/ Warren Voss
/s/ Peter Field, President

LOUIS W. CARLSON
/s/ 

LORA M. CARLSON
/s/ 

STATE OF WYOMING
ss
COUNTY OF WESTON

The foregoing agreement was acknowledged before me this 31st day of August, 1977, by /s/ Warren Voss & Peter Field the Secretary of Water Unlimited, Inc., a Wyoming corporation, on behalf of said corporation.

Witness my hand and official seal.
/s Rebecca K. Hawki
Notary Public

My commission expires: November 28, 1979.

STATE OF WYOMING
ss
COUNTY OF WESTON

The foregoing agreement was acknowledged before me this 31st day of August, 1977, by Louis W. Carlson and Lora M. Carlson, husband and wife.

Witness my hand and official seal.
/s Rebecca K. Hawki
Notary Public

My commission expires: November 28, 1979.

THOMAS, Justice, dissenting.

I cannot agree that this case should be reversed. Our definition of an ambiguous

contract is that, upon consideration of the whole instrument, it is:

"'* * * [A]n agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present. * * *' *Bulis v. Wells*, Wyo., 565 P.2d 487, 490 (1977). And see *Meuse–Rhine–Ijssel Cattle Breeders of Canada Ltd. v. Y–Tex Corporation*, Wyo., 590 P.2d 1306 (1979); *Amoco Production Company v. Stauffer Chemical Company of Wyoming,* supra [Wyo., 612 P.2d 463 (1980)]." *McCartney v. Malm*, 627 P.2d 1014, 1019 (Wyo.1981).

The majority opinion recites from *Amoco Production Company v. Stauffer Chemical Company of Wyoming*, 612 P.2d 463 (Wyo.1980), the applicable legal precepts, including the requirement that the contract be considered as a whole. It then states quite positively that the contract that is involved is unambiguous. The argument is strong, but the analysis is frail. In making the assertion that "[t]he intent of the parties as expressed in this agreement is to tie inextricably together the Carlsons' water right established by the agreement and Carlsons' line maintenance responsibility," the majority addresses only part of the contract. Op. at ——. The imposition of the line maintenance charge by Water Unlimited upon third-party users of the water is tied to their ownership of the land. It has no direct relationship to the line maintenance responsibility of the Carlsons. Stated another way, the shift of the responsibility for line maintenance "between the south side of U.S. Highway 16 and the point of delivery to Carlson" depends upon the sale of the water right, not upon a retention of a partial interest in the Carlsons' property.

Instead, the Agreement inextricably ties the free use of the Carlsons' water right to their continued ownership of the land described in paragraph one of the Agreement. Paragraph one provides:

"1. Water Unlimited will deliver water from the Carlson Well No. 1 or any other wells drilled on the hereinabove described property to Carlson in such quantities as Carlson may use, need or desire in the area known as Mountain View Trailer Park owned by Carlson which land is situated within the City of Newcastle, Wyoming, and is described as follows: * * *."

If any significance is to be given to the phrase "owned by Carlson," the Carlsons, after the sale, had no right to have water delivered to the portion of the premises owned by the Egges and the Pattons. The obligation imposed upon Water Unlimited is to "deliver water from the Carlson Well No. 1 or any other wells drilled on the * * * [same property] to Carlson in such quantities as Carlson may use, need or desire in the area known as Mountain View Trailer Park owned by Carlson * * * [emphasis added]." It is clear that this condition no longer pertains as to part of the tract. As to the part of the property that has been sold, can it be said that the water delivered to the purchasers fits within the quantities of water that Carlson may use, need or desire?

The majority position depends upon a conclusion that Carlsons have not sold "all of their right, title and interest in the land described in paragraph 1 above to any third party * * *." Literally, that is true, but they have sold all of their right, title and interest to part of that land. Yet, the majority avows that only after the Carlsons have sold the entire tract will it be right and fair that Water Unlimited be permitted to impose a line maintenance charge upon any purchasers, even though those who have purchased part of the land have no line maintenance responsibilities.

Paragraph two states:

"2. Water Unlimited will deliver such water to Carlson at no charge so long as either Louis W. Carlson or Lora M. Carlson, or their heirs, are the owners of the land described in paragraph one above."

It is clear from the record that the conditions of paragraph two no longer pertain. The Carlsons now own only part of the land described in paragraph one, and the Egges and the Pattons now own the other part of that land. Perhaps the true resolution is that the water right has been termi-

nated since the Carlsons or their heirs no longer own the entire tract described in the Agreement. This result is certainly as reasonable as the one adopted in the majority opinion, but that would be an intolerable solution.

The next paragraph of the Agreement provides:

"3. It is agreed that at such time as Louis W. Carlson and Lora M. Carlson, or the survivor of them, or their heirs, shall sell all of their right, title and interest in the land described in paragraph 1 above to any third party, then the water right established by this agreement shall continue in favor of such third party from the date of such sale or transfer, provided however, that from the date of such sale Water Unlimited shall have the right to charge the then owner a line maintenance charge in the amount of fifteen cents ($.15) per 1000 gallons of water used and delivered, with the further understanding that such line charge may be adjusted annually, either upwards or downwards, by Water Unlimited in accordance with the cost of living index arrived at by the United States government on June 1 of each year as compared to the cost of living index on the date of this contract. It is understood and will be required that the purchaser of this water right at the time of sale shall be required to install a meter at a point to be designated by Water Unlimited and the cost of the meter and of its installation shall be borne by said purchaser."

It would seem that, under the language of this paragraph, the Egges and the Pattons did not receive any right to water by virtue of their purchase from the Carlsons. Their right to water, if any there is, must be found under paragraph 1 of the Agreement.

The Agreement provides for the continuation of the water right to a purchaser from the Carlsons, expressly reserving the right to impose the line maintenance charge. It is silent as to the event of a sale of part of the premises. Unless the Carl-

sons made some different arrangement with the partial purchasers to assume the Carlsons' line maintenance responsibilities, the Carlsons must have those same responsibilities as long as they own part of the property.

The rationale invoked by the majority begs the question in this case, which is, What did the parties intend with respect to a line maintenance charge in the event of a partial sale of the Carlsons' property? As to that event, the Agreement is silent, and that silence equates with ambiguity. This is "an agreement which is obscure in its meaning, because of indefiniteness of expression, or because a double meaning is present." *Bulis*, 565 P.2d at 490. Certainly, paragraphs 2 and 3 of the Agreement can be read in at least two ways. *Rouse v. Munroe*, 658 P.2d 74 (Wyo.1983). Paragraph 2 would lead to a conclusion that Water Unlimited no longer has a duty to deliver water to the Carlsons since they no longer own the land described in paragraph 1. Paragraph 3 can be read to provide for a continuation of the water right in favor of a purchaser, but only a purchaser of the entire tract. Otherwise, it is lost to the purchaser. This is a contract that can be understood in more than one way. *Hollabaugh v. Kolbet*, 604 P.2d 1359 (Wyo.1980).

The logical result of the majority rationale is that, so long as Carlsons own even one square foot of the property described in the Agreement, Water Unlimited must follow the terms of the Agreement and cannot impose the line maintenance charge. If it is true that "[r]eason is the life of the law,"[1] then such an extreme consequence must be the antithesis of legal life.

The thrust of the majority opinion is that a privilege to be free of the line maintenance charge that was personal to the Carlsons has been extended to purchasers from the Carlsons, even though those purchasers are contributing nothing to the maintenance of the water service. I do not think this eventuality is addressed in the Agreement, and I find sufficient inconsistencies to make the Agreement obscure in its

1. Sir Edward Coke, First Institute (1628).

meaning, because of indefiniteness of expression or because a double meaning is present, as defined by this court and as applied to the circumstances that actually occurred. Consequently, the question of the intention of the parties became one of fact for the trial court, and it correctly decided that question. I would affirm the decision of the trial court and remand the case for further proceedings in accordance with the determination of the trial court.