W.A. MONCRIEF, Jr., Appellant
(Plaintiff),

v.

The LOUISIANA LAND AND EXPLO-
RATION COMPANY; BHP Petroleum
Company, Inc.; Inexco Oil Company;
and North Central Oil Corporation, Ap-
pellees (Defendants).

MYCO INDUSTRIES, INC. and Yates
Drilling Company, Appellants
(Plaintiffs),

v.

The LOUISIANA LAND AND EXPLO-
RATION COMPANY; BHP Petroleum
Company, Inc.; Inexco Oil Company;
and North Central Oil Corporation, Ap-
pellees (Defendants).

Nos. 92–23, 24.

Supreme Court of Wyoming.

Feb. 23, 1993.

Motion to Vacate Mandate Denied
and Rehearing Granted
March 16, 1993.*

* Cardine, J., would have denied the petition for rehearing.

Morris R. Massey of Brown & Drew, Casper, and Robert C. Grable of Kelly, Hart & Hallman, Fort Worth, TX, for appellant W.A. Moncrief, Jr.

Phillip Wm. Lear of Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, UT, for appellants MYCO Industries, Inc. and Yates Drilling Co.

Marilyn Kite and Jack D. Palma, II of Holland & Hart, Cheyenne, and Peter A. Bjork and James L. Simmons of Poulson, Odell & Peterson, Denver, CO, for appellees.

Before MACY, C.J., and THOMAS, CARDINE, URBIGKIT ** and GOLDEN, JJ.

** Chief Justice at time of oral argument; retired January 1, 1993.

URBIGKIT, Justice.

This appeal presents a dispute between parties to an oil and gas unit operating agreement regarding the interests each holds in a 640–acre drilling unit and when those interests vested. The district court granted defendants' motion for summary judgment finding no genuine issues of material fact and, as a matter of law, plaintiffs did not have a vested interest in certain farmout acreage. This finding resulted in the district court's decision that plaintiffs could not count the farmout acreage as their own in calculating the percentage ownership interests of the parties consenting to a drilling operation.

We reverse and remand for further proceedings.

## I. ISSUES

Appellant, W.A. Moncrief, Jr. (Moncrief), submits the following issues:

A. The district court erred in ruling that the Farmout acreage did not constitute a committed working interest.

B. The district court erred in ruling that the Farmout acreage was not a carried working interest.

C. The district court erred in concluding that the Farmout acreage did not qualify as a working interest under the Unit Agreement.

D. The district court erred in ruling that Moncrief was not vested with an interest in the nature of equitable title.

E. The district court erred in concluding that the interest of Moncrief in the Farmout was not an interest in the lease under the federal regulations.

Appellants, MYCO Industries, Inc. (MYCO) and Yates Drilling Company (Yates), submit the following issues:

A. Whether the district court committed reversible error by considering the consenting parties' ownership interests at the time the well was proposed instead of at the time drilling operations commenced thereby concluding that the 160–acre tract was not "committed working interest" acreage owned by a party to the Supplemental Unit Operating Agreement?

B. Whether the district court committed reversible error by concluding Amoco's interest was not a "carried working interest" even though the farmees held a present interest in the working interest of the 160–acre tract and were obligated to pay all of the costs of the well while Amoco had no obligation to contribute to the costs?

Appellees present the issue as follows:

The District Court was correct in ruling that Moncrief, MYCO, and Yates are not a "majority in interest" in the drilling of the Exploratory Well in the Madden Deep Gas Unit.

## II. BACKGROUND

We begin our discussion with a brief synopsis of farmout agreements to provide a backdrop for our opinion and to clarify the terminology associated with farmout arrangements.[1]

An oil and gas farmout agreement is an executory contract whereby one who owns drilling rights agrees to assign all or a portion of the rights to another in return for drilling and testing on the property. *Petroleum Financial Corporation v. Cockburn*, 241 F.2d 312, 313 (5th Cir.1957); Blair Klein & Noel Burke, *The Farmout Agreement: Its Form and Substance*, 24 Rocky Mtn.Min.L.Inst. 479, 480 (1978); John S. Lowe, *Analyzing Oil and Gas Farmout Agreements*, 41 Sw.L.J. 759, 763

---

1. The following articles provide good background on farmout agreements: John S. Lowe, *Analyzing Oil and Gas Farmout Agreements*, 41 SW.L.J. 759 (1987); Hugh V. Schaefer, *The Ins and Outs of Farmouts: A Practical Guide for the Landman and the Lawyer*, 32 Rocky Mtn. Min.L.Inst. 18–1 (1986); Edwin M. Cage, *Anatomy of a Farmout*, 21 Inst. on Oil & Gas L. & Tax'n 153 (1970); Earl A. Brown, *Assignments of Interest in Oil and Gas Leases, Farm-out Agreements, Bottom Hole Letters, Reservations of Overrides and Oil Payments*, 5 Inst. on Oil & Gas L. & Tax'n 25 (1954); Blair Klein and Noel Burke, *The Farmout Agreement: Its Form and Substance*, 24 Rocky Mtn.Min.L.Inst. 479 (1978); Richard W. Hemingway, *The Farmout Agreement: A Story Short But Not Always Sweet*, 1 Nat.Resources & Env't 3 (Spring 1985).

(1987). The individual or entity who owns the lease is the farmor. The person or entity that receives the right to drill is the farmee. The farmor is said to "farm out" its rights; the farmee is said to have "farmed in" to the lease. Lowe, *supra*, 41 Sw.L.J. at 763.

A farmout agreement differs functionally from an operating agreement. An operating agreement is an agreement between owners of the right to drill in an area that sets out the rights and duties of each in operations on the property subject to the contract. A farmout agreement is a contract by which one party earns an interest in an oil and gas lease owned by another. The operating agreement defines the rights and duties of parties who already own joint interests in a lease or drilling unit. *Id.* at 764.

Additionally, under a farmout agreement, the farmee carries the farmor for all or a portion of the costs of drilling and exploration, while parties to an operating agreement generally share the costs. *Id.*

The use of the farmout agreement, as a vehicle for the exploration and development of oil and gas properties, expanded greatly after World War II. Hugh V. Schaefer, *The Ins and Outs of Farmouts: A Practical Guide for the Landman and the Lawyer*, 32 Rocky Mtn.Min.L.Inst. 18–1, 18–3 (1986); Lowe, *supra*, 41 Sw.L.J. at 762. This proliferation stemmed in part from the increased risks and costs of deeper drilling and continued with the increased number and sophistication of smaller oil companies which accompanied the rising oil prices in the 1970's.[2] Farmout agreements remain a commonly used tool in the oil and gas industry. Lowe, *supra*, 41 Sw.L.J. at 762.

The reasons for entering into a farmout arrangement vary. A farmor's motivation for farming out its lease may include any of the following:

* Lease preservation—farmor may be approaching the end of its lease without the resources to drill;
* Lease salvage—farmor's geologists and physicists may evaluate the lease as a poor prospect, but farmor will try to salvage something of value from the lease;
* Risk-sharing;
* Exploration and evaluation—to obtain geological information to help evaluate other leases in the area;
* Market access;
* Obtaining reserves—farmor may not be an operator and wants only a share of production. This is common for pipelines, other transporters and refineries.

A farmee may farm into a lease for the following reasons:

* It is the quickest and cheapest way to obtain or expand acreage position or obtain reserves;
* Farmee may have cash, equipment, or personnel it wishes to keep busy;
* Farmee may highly evaluate property farmor has dismissed as a poor prospect;
* Farmee may want to become active in an area but is unwilling to take the risks alone.

Tax advantages may also motivate a party to enter into a farmout agreement. Lowe, *supra*, 41 Sw.L.J. at 778–82; Klein & Burke, *supra*, 24 Rocky Mtn.Min.L.Inst. at 481–82; Schaefer, *supra*, 32 Rocky Mtn. Min.L.Inst. at 18–5.

The primary defining characteristics of a farmout agreement are the duty it imposes on the farmee and its earning factor—what farmee must do to earn an interest in the farmout acreage. Lowe, *supra*, 41 Sw.L.J. at 792.

Farmout agreements are characterized as either obligation-to-drill contracts or option-to-drill contracts. Most farmout contracts are of the option-to-drill variety.

---

**2.** The average depth of wells drilled in the United States between 1975 and 1981 was approximately 4,500 feet; costs in that time increased 155%. The average price of crude oil at the wellhead in the United States increased from $3.89 per barrel in 1973 to $31.77 per barrel in 1981; natural gas prices increased from 21.6 cents per MCF to $1.98 per MCF during this same period. Lowe, *supra*, 41 SW.L.J. at 762 nn. 1 & 2.

The farmee controls the decision whether to drill, is under no obligation to drill and faces no liability if it does not drill. It only loses the opportunity to participate in the farmout agreement if it fails to commence a well by the time provided in the contract. Conversely, under an obligation-to-drill contract, the agreement expressly provides that the farmee must drill. Failure to drill may expose the farmee to substantial liability. Lowe, *supra*, 41 Sw.L.J. at 793; Schaefer, *supra*, 32 Rocky Mtn.Min.L.Inst. at 18–6.

Farmout agreements are further classified as either produce to earn farmouts or drill to earn farmouts. Under a drill to earn farmout, the farmee earns the interest in the farmout acreage once drilling commences. This type of farmout is usually motivated by farmor's desire to test and explore, rather than by a desire to allocate risks or preserve a lease. Lowe, *supra*, 41 Sw.L.J. at 793.

Under a produce to earn farmout, farmee must drill a well to production. The well must generally be producing in payable quantities before farmee will earn the interest in the farmout acreage. Produce to earn farmouts are common if the farmor's motivation is lease preservation. *Id.*

Farmout contracts usually define performance standards or conduct of operation standards farmee must adhere to once drilling has commenced. Typical standards of performance include requirements of good faith drilling in a workmanlike manner and due diligence in drilling. These standards may affect the farmee's potential liability. Lowe, *supra*, 41 Sw.L.J. at 818; Klein & Burke, *supra*, 24 Rocky Mtn.Min.L.Inst. at 483, 495.

Equipped with the basics of farmout agreements, we proceed with the facts of this case and our discussion.

### III. FACTS

On May 1, 1967, the parties to this dispute, or their predecessors in interest, entered into a unit agreement for the Madden Deep Unit Area (Unit Agreement) covering about 70,000 acres in Natrona and Fremont Counties, Wyoming. The tract of land at issue in this case is committed to the Madden Deep Unit and covered by the Unit Agreement.[3] It is subject to a federal oil and gas lease which Amoco Production Company (Amoco) held when this action was filed.

On June 17, 1969, the parties to the Unit Agreement entered into a Revised Unit Operating Agreement (Revised UOA). The parties to this Revised UOA include, among others, appellants, Amoco, and appellees, or their respective predecessors in interest. As to *all* parties, the Revised UOA governs unit operations at depths *above* the base of the Waltman Shale.

On June 2, 1975, certain parties to the Revised UOA, or their successors in interest, executed a Supplemental Unit Operating Agreement (Supplemental UOA). The parties to the Supplemental UOA were: (1) Moncrief; (2) Inexco Oil Company; (3) Sohio Petroleum Company; (4) North Central Oil Corporation; (5) W.R. Grace and Company; (6) Colorado Oil and Gas Corporation; (7) Yates; (8) Martin Yates, III (now MYCO's interest); (9) Harold B. Ehrlich; and (10) Monsanto Company (now BHP Petroleum Company, Inc.).

The Supplemental UOA governs unit operations at depths of more than 5,500 feet *below* the base of the Waltman Shale (the deep rights). The Revised UOA continues to govern all unit operations at depths above the base of the Waltman Shale, and it continues to govern the deep rights of those parties to the Revised UOA who were not parties to the Supplemental UOA, including Amoco. Either the Revised UOA or the Supplemental UOA, or both, apply to Madden Deep Unit operations, depending upon the depth of the drilling and the parties participating in the drilling.

In May, 1990, Moncrief obtained a commitment from Amoco to execute a farmout

---

**3.** The tract's legal description is the NE ¼ of Section 12 in Township 38 North, Range 89 West, 6th P.M.

agreement covering the NE ¼ of Section 12, T38N, R89W, 6th P.M. (the Farmout Acreage). Moncrief and Amoco finalized and signed the Farmout Agreement on July 5, 1990, with some later minor modifications not relevant to this dispute's resolution.

Under the Farmout Agreement, Moncrief, as farmee, agreed to commence the drilling of a test well on or before December 31, 1990, at his sole expense and risk. Once drilling commenced, the Farmout Agreement provided:

> [The well] shall be continuously prosecuted, with due diligence and in a workmanlike manner, to a subsurface depth of 20,000 feet or to a subsurface depth sufficient to test the Cody formation, whichever is the lesser depth ("contract depth"), and shall then be completed as a producing well, a well capable of production, or plugged and abandoned within ninety (90) days from the date of commencement.

In exchange, Amoco, as farmor, promised to assign to Moncrief all of its right, title and interest in and to the Farmout Acreage, reserving an overriding royalty of 12.5% of ⅛.

By letter dated May 31, 1990, Moncrief proposed to the working interest owners in Section 12, T38N, R89W that a 24,500 foot test well be drilled in the SW ¼ of the NE ¼ of the section. Moncrief designated the entire 640 acres of Section 12 as the drilling block for this exploratory well. At this same time, Moncrief offered the working interest owners an opportunity to participate in the Farmout Agreement.

Moncrief, Grace, Yates, and MYCO (the Consenting Parties) elected to participate in the drilling of the well. In addition, Yates agreed to participate in the Farmout Agreement with Moncrief. Louisiana Land and Exploration Company, BHP Petroleum Company, Inc., Inexco Oil Company, and North Central Oil Corporation (the Non–Consenting Parties) elected not to participate in the well or the Farmout Agreement.

Moncrief commenced the well on the designated drilling block on August 24, 1990.

As provided in the Supplemental UOA, the Consenting Parties bore the costs of drilling in proportion to their shares of the drilling acreage. Moncrief and Yates bore the costs attributed to the Farmout Acreage.

Moncrief brought this action on September 6, 1990, seeking a declaration that, as defined by the Supplemental UOA, the Consenting Parties constituted a "majority in interest" in the 640–acre drilling block. The designation of the Consenting Parties as a "majority in interest" or a "minority in interest" determines the amount of the penalty the Non–Consenting Parties must pay before receiving any payout from the well.

If the Consenting Parties are a minority in interest, the Non–Consenting Parties must pay a penalty of 1000% of the drilling costs. If the Consenting Parties are a majority in interest, the Non–Consenting Parties must assign to the Consenting Parties their interests in a four-section area as to depths above 19,000 feet and a nine-section area as to depths below 19,000 feet.

On April 10, 1991, Moncrief, Yates and MYCO filed a motion for summary judgment alleging that no genuine issue of material fact existed and, as a matter of law, the Consenting Parties were entitled to count the Farmout Acreage as consenting and were therefore a majority in interest.

On July 5, 1991, appellees filed a cross-motion for summary judgment arguing that, as a matter of law, the Consenting Parties were only a minority in interest.

The Farmout Acreage consists of 160 acres. If it is counted as consenting acreage, the Consenting Parties would hold 370 acres of the 640–acre drilling block—a majority interest. If the 160 acres are counted as non-consenting acreage, the Consenting Parties would hold only 210 acres of the 640–acre drilling block—a minority interest. Finally, if the 160 acres are simply not counted at all—as neither consenting nor non-consenting—and the drilling block is reduced to 480 acres, the Consenting Parties would hold only 210 acres of the 480 acres—a minority interest.

The district court found, as a matter of law, that the Farmout Acreage should not be counted as consenting acreage and that appellants were, therefore, a minority in interest. Summary judgment was entered by the district court in favor of appellees. The record is unclear as to whether the district court determined the Farmout Acreage was non-consenting acreage or whether it determined the acreage should not be counted at all.

## IV. STANDARD OF REVIEW

■ Summary judgment is proper when no genuine issues of material fact exist, and the prevailing party is entitled to judgment as a matter of law. *Allmaras v. Mudge*, 820 P.2d 533, 535 (Wyo.1991); *Baros v. Wells*, 780 P.2d 341 (Wyo.1989); *Farr v. Link*, 746 P.2d 431 (Wyo.1987). A material fact is one which would establish or refute an essential element of the cause of action or defense asserted by the parties. *Allmaras*, 820 P.2d at 535; *Albrecht v. Zwaanshoek Holding En Financiering, B.V.*, 762 P.2d 1174 (Wyo.1988); *Johnston v. Conoco, Inc.*, 758 P.2d 566 (Wyo.1988).

■ Summary judgment is inappropriate for the determination of claims in which issues of intent play a dominant role. *Powder River Oil Co. v. Powder River Petroleum Corp.*, 830 P.2d 403, 407 (Wyo.1992); *Cordova v. Gosar*, 719 P.2d 625 (Wyo. 1986). If we find that an inquiry into the facts was necessary for proper application of the law, we must overturn the summary judgment. *Cordova*, 719 P.2d at 635; *Kimbley v. City of Green River*, 642 P.2d 443 (Wyo.1982). We accord no deference to and are not bound by the trial court's decisions on issues of law. *Powder River Oil Co.*, 830 P.2d at 407; *True Oil Co. v. Sinclair Oil Corp.*, 771 P.2d 781 (Wyo. 1989).

In this case, we will resolve preliminary issues of law and then remand the case to the district court for findings of fact we deem material to the outcome of this dispute. These findings were inappropriate for summary judgment, because such findings involve questions of the parties' intent in light of the circumstances in which they executed their agreements.

## V. DISCUSSION

### A. *Equitable Conversion*

Appellants pose the question of whether a farmee can earn an equitable interest in farmout acreage, through application of the doctrine of equitable conversion, prior to earning legal title to the farmout acreage. We conclude the doctrine of equitable conversion can be applied to farmout agreements and a farmee can earn an equitable interest in the farmout acreage.

■ The doctrine of equitable conversion typically applies to contracts involving the sale of land and the conveyance of title, and has long been recognized in Wyoming. *Metropolitan Mortg. & Securities Co., Inc. v. Belgarde*, 816 P.2d 868, 872 (Wyo. 1991); *Matter of Estate of Ventling*, 771 P.2d 388, 390 (Wyo.1989); *Baldwin v. McDonald*, 24 Wyo. 108, 156 P. 27, 35 (1916); *Olds v. Little Horse Creek Cattle Co.*, 22 Wyo. 336, 140 P. 1004, 1007 (1914). Applying equitable conversion effects an exchange of property from real to personal or personal to real, even though no actual change has transpired. *Matter of Estate of Ventling*, 771 P.2d at 390; *Olds*, 140 P. at 1007; Black's Law Dictionary 332 (6th ed. 1990). The vendee is treated as the equitable owner of the land, and the vendor as the owner of the purchase money. "The doctrine of equitable conversion flows from the maxim that 'equity regards and treats as done what, in good conscience, ought to be done.'" *Matter of Estate of Ventling*, 771 P.2d at 390.

We can logically extend the doctrine's application to farmout contracts. We have previously concluded that a farmee can earn equitable title to farmout acreage. *Cities Service Oil Co. v. Pubco Petroleum Corp.*, 497 P.2d 1368, 1373 (Wyo.1972). In *Cities Service Oil Co.*, a farmout agreement was entered into with The Colorado Corporation. *Id.* at 1369. Under that agreement, Cities Service Oil Co., farmor, agreed to assign its interest in the farmout acreage to The Colorado Corporation, far-

mee, in exchange for farmee's promise to complete a well on the acreage. *Id.* In analyzing the farmout agreement between the parties in *Cities Service Oil Co.,* we analogized the farmout contract to a land contract: "Undoubtedly this practice in the oil business is as common as the practice in real estate transactions of escrowing contracts for deed, without recording the deed until performance by the purchaser." *Id.* at 1373. We commented further on the farmout relationship, noting: "Colorado [Corporation] had no legal title until the contemplated well had been completed. However, it did have a potential or equitable interest[.]" *Id.*

▮ The doctrine of equitable conversion can apply only if the parties have executed a valid agreement that binds both parties, placing obligations on both the vendor and the vendee. *Belgarde,* 816 P.2d at 873; *Olds,* 140 P. at 1007. The doctrine cannot be applied to options or unilateral contracts, because the vendor cannot be treated as an equitable owner of the purchase money if the purchaser is not obligated to pay the purchase money. *Id.*

In *Covey v. Covey's Little America, Inc.,* 378 P.2d 506, 517 (Wyo.1963), we defined an option contract:

> An option is a continuing offer to sell and, even though it is conditioned for exercise within a limited time, the option is nevertheless an executory, unilateral contract. * * * The exclusive right to conclude the transaction must be vested solely in the optionee, and the optionor must have no choice but to abide by the terms of the commitment.

*See also Braten v. Baker,* 78 Wyo. 273, 323 P.2d 929, 931 (1958).

▮ Prior to the well's commencement, the Farmout Agreement between Moncrief and Amoco was a unilateral option contract. Amoco was bound to hold the farmout offer open until December 31, 1990. Until that date, Moncrief could exercise the option by commencing drilling operations, but was under no obligation to do so. If Moncrief failed to commence a well, he faced only the loss of the Farmout Agreement; the contract was not specifically enforceable against him.

▮ We have previously held that once an option is exercised, it converts from a unilateral contract into a bilateral contract. In *Madison v. Marlatt,* 619 P.2d 708, 714 (Wyo.1980) (citing *Braten,* 323 P.2d at 931) (footnote omitted), we stated:

> In Wyoming, an option contract has been held to be a unilateral contract, in which the optionor promises not to revoke an offer to sell for a specific period of time. The contract becomes a bilateral contract, binding upon both parties, if within the specified time period the optionee elects to accept the offer.

*See also Crockett v. Lowther,* 549 P.2d 303 (Wyo.1976).

Once Moncrief commenced the well, Moncrief effectively exercised the option and the Farmout Agreement became a bilateral contract, binding upon both parties. The language in the contract obligated Moncrief to complete a producing well, and Amoco was, in turn, obligated to assign to Moncrief its interest in the farmout acreage upon the well's completion.[4]

The language contained in the Farmout Agreement between Moncrief and Amoco,

---

**4.** The Farmout Agreement states as follows:

2. Farmee, on or before December 31, 1990, agrees to commence or to participate in, as to Farmor's interest, the actual drilling of a test well at a legal location in the NE/4 of Section 12, Township 38 North, Range 89 West, Natrona County, Wyoming. Said well, once commenced, *shall be continuously prosecuted, with due diligence and in a workmanlike manner,* to a subsurface depth of 20,000 feet or to a subsurface depth sufficient to test the Cody formation, whichever is the lesser depth ("contract depth"), and *shall* then be completed as a producing well, a well capable of production, or plugged and abandoned within ninety (90) days from the date of commencement. Said test well *shall* be drilled at Farmee's sole cost, risk and expense.

\* \* \* \* \* \*

6. If Farmee has * * * complied with the terms hereof, Farmor agrees * * * to execute and deliver to Farmee an assignment of all of its right, title and interest in and to the Subject Lands[.]

(Emphasis added.)

defining the standards of performance ("due diligence and in a workmanlike manner," *see* n. 4, *supra* ), is similar to the language of a farmout contract at issue in the Texas case of *Davis v. Zapata Petroleum Corp.*, 351 S.W.2d 916 (Tex.Civ.App. 1961). In that case, the court was presented with the question of the amount of damages, if any, a farmor was entitled to when the farmee breached the farmout agreement. *Id.* at 918. The court described the farmout agreement as follows:

> By the terms of a "farmout" letter dated January 7, 1958, appellant and his associates agreed to assign a portion of such lease to Zapata, and Zapata agreed to commence drilling operations on the assigned premises with either a cable tool or a rotary rig, on or before February 1, 1958, *and thereafter, with due diligence and in a workmanlike manner, continue its development operations upon the assigned premises* until: (a) such operations resulted in production; or (b), 30 days after giving notice of its intention to abandon such operations.

*Id.* (emphasis added). Zapata, farmee, had commenced drilling but had not drilled in a manner that preserved the farmor's lease. *Id.* at 919. The question the court addressed was not whether the language of the farmout agreement *obligated* the farmee to continue drilling after commencing the well, the court proceeded on the premise that it did, a premise neither party contested (the farmee's answers to the farmor's complaint did not deny that a duty was owed, rather it asserted it had fulfilled its obligations). *Id.* at 919. The *Davis* court restated the issue as *"whether the operations of Zapata were sufficient to satisfy its obligations to the appellant Davis and his associates under the terms and conditions of the farmout letter of January 7, 1958."* *Id.* at 921 (emphasis in original). That is, did Zapata continue its operations with due diligence and in a workmanlike manner as the farmout agreement obligated it to do?

The language of the two agreements, the agreement between Amoco and Moncrief and the agreement at issue in *Davis*, is

nearly identical, and we agree with the *Davis* court's reasoning that such language obligates a farmee to continue drilling once drilling has commenced. We conclude that the language of the Farmout Agreement between Moncrief and Amoco obligated Moncrief to continue drilling with due diligence and in a workmanlike manner once drilling had commenced. Therefore, the Farmout Agreement executed by Moncrief and Amoco satisfies the mutuality requirement for application of the doctrine of equitable conversion.

Our conclusion that Moncrief and Yates earned an equitable interest in the farmout acreage when the well was commenced disposes of the issues regarding whether Moncrief and Yates had an interest in the farmout acreage. Therefore, we decline to address appellants' questions of whether the farmout acreage constituted a carried interest or a committed working interest, or whether Moncrief's interest in the farmout acreage was an interest in the lease under the federal regulations.

### B. *Questions of Fact*

Before the district court applies the doctrine of equitable conversion to this dispute, it must resolve two crucial questions of fact. The first question is whether all acreage within the 640–acre drilling block designated by Moncrief must be accounted for as either consenting or non-consenting. The second question is: when should the parties' ownership interests be assessed— when the parties elect to participate or not participate in the drilling operations, or when the well is actually commenced? The answers to these questions are found in the Revised and Supplemental Unit Operating Agreements (UOA's).

Our rules of contract construction are well established. The determination of the parties' intent is our prime focus in interpreting or construing a contract. *True Oil Co.*, 771 P.2d at 790; *State v. Moncrief*, 720 P.2d 470 (Wyo.1986); *Amoco Production Co. v. Stauffer Chemical Co. of Wyoming*, 612 P.2d 463 (Wyo.1980). If an agreement is in writing, and its language is clear and unambiguous, the par-

ties' intention is to be secured from the words of the agreement. *True Oil Co.,* 771 P.2d at 790; *Nelson v. Nelson,* 740 P.2d 939, 940 (Wyo.1987); *Kost v. First Nat. Bank of Greybull,* 684 P.2d 819 (Wyo. 1984). When the agreement's language is clear and unambiguous, the writing as a whole should be considered, taking into account relationships between various parts. *True Oil Co.,* 771 P.2d at 790; *Kost,* 684 P.2d at 823; *Rouse v. Munroe,* 658 P.2d 74 (Wyo.1983). Contract construction and interpretation are done by the court as a matter of law. *True Oil Co.,* 771 P.2d at 790; *Amoco Production Co.,* 612 P.2d at 465; *Bulis v. Wells,* 565 P.2d 487 (Wyo. 1977).

 If the contract is ambiguous, the intent of the parties may be determined by resort to extrinsic evidence. *True Oil Co.,* 771 P.2d at 790; *Rouse,* 658 P.2d at 78; *Busch Development, Inc. v. City of Cheyenne,* 645 P.2d 65, 68 (Wyo.1982); *Mountain Fuel Supply Co. v. Central Engineering & Equipment Co.,* 611 P.2d 863 (Wyo.1980). An ambiguous contract is one which is obscure in its meaning because of indefiniteness of expression or because of a double meaning being present. *True Oil Co.,* 771 P.2d at 790; *Hensley v. Williams,* 726 P.2d 90 (Wyo.1986).

 The following operating agreement provisions address the accounting of acreage within the drilling block. Article 6.2 of the Supplemental UOA stated:

Any Party desiring the Drilling of an Exploratory Well or a Development Well * * * on land in which it owns a Committed Working Interest shall designate an area herein called a Drilling Block, not to exceed 640 acres, which, on the basis of available geological information, should reasonably be proved productive by the Drilling of such well. * * * *Each Party within the Drilling Block shall participate* in the Costs of the proposed well on an Acreage Basis, *unless such Party elects not to participate* (as a Non–Consenting Party) as provided below and in Article 10.

(Emphasis added.) Article 8.3 of the Revised UOA stated:

Within thirty (30) days after receipt of such notice, *each Party within such participating area shall advise all other Parties therein, in writing, whether or not it wishes to participate in Drilling the proposed well.* If all the Parties within such participating area so advise that they wish to participate therein, the proposed well shall be Drilled by Unit Operator for the account of all the Parties within the participating area. *If any Party fails to respond to such notice within said thirty (30) day period, it shall be deemed to have elected not to participate in Drilling the proposed well.*

(Emphasis added.) The language of both operating agreements requiring all parties to either consent or not consent can be read to require that all acreage be accounted for as either consenting or non-consenting. However, the language is not clear and unambiguous; it is not a clear expression that all acreage within the drilling block must be counted as either consenting or non-consenting. Therefore, the district court may consider extrinsic evidence relating to the circumstances in which the parties entered into the operating agreements.

The circumstances in which the parties entered into their operating agreements and their intent, in light of those circumstances, can greatly affect the district court's interpretation of the agreements' provisions. For example, the evidence may show that the parties executed their agreements understanding that the deep wells would be extremely expensive to drill and the business risks inherent in their drilling would be substantial. The parties may, therefore, have desired to distribute that risk and cost as broadly as possible. Perhaps, then, the parties would have intended that all acreage within a designated drilling block consent or non-consent so as to spread the costs and risks broadly through apportionment of the costs among consenting parties and through the assessment of penalties against non-consenting parties. This is not clear from the record, though, and remains a question of fact for the district court to resolve.

■ The operating agreements also fail to clearly answer the question of when to assess the parties' interests in the drilling block acreage. The following provisions may provide guidance. Article 1.9 of the Supplemental UOA stated:

"Drilling Party" or "Consenting Party" means the Party or Parties obligated to bear the Costs incurred in Drilling, Deepening, or Plugging Back a well in accordance with this agreement *at the commencement of such operation.*

(Emphasis added.) Article 1.9 of the Revised UOA stated:

"Drilling Party" means the Party or Parties obligated to bear the Costs incurred in Drilling, Deepening or Plugging Back a well in accordance with this agreement *at the commencement of such operation.*

(Emphasis added.)

Appellants argue these provisions dictate that the interests be assessed when the well is commenced. They contend that, based on the above quoted language, a party does not become a consenting party until commencement of drilling operations. Therefore, to determine whether the consenting parties constitute a majority interest in the drilling block, the critical time to assess ownership interests is at the commencement of operations.

Appellees argue, conversely, that it is unfair to calculate the interests at a time other than when the election is made—that they should be able to make an informed decision whether to participate in the operation based upon the amount of penalty to which they will be subject if they decline to participate.[5]

The language of the operating agreements provides no clear test to determine when the parties' interests should be assessed. The district court should again consider extrinsic evidence to ascertain the parties' intent. The district court must determine whether the parties intended that the election and penalty provisions facilitate the parties' decision-making and accommodate their speculations when deciding whether to participate in the well; or, whether the provisions were designed to distribute the costs and risks of drilling the deep wells by discouraging parties from opting out or electing not to drill; or, whether the parties intended something entirely different.

C. *Summary of Dispute*

The district court's resolution of the above outlined questions of fact will dictate this dispute's outcome.

If the district court finds that all acreage within the 640–acre drilling block must be accounted for as consenting or non-consenting, and that the parties' ownership interests should be assessed when drilling commences, it would follow that the consenting parties hold a majority interest. Once drilling has commenced, Moncrief and Yates would have an equitable interest in the farmout acreage and would be entitled to count the acreage as their own. This means the acreage would be included as consenting acreage, giving the consenting parties 380 of 640 acres—a majority interest.

If the district court determines that only 480 acres of the 640–acre drilling block need be accounted for as either consenting or non-consenting (excluding the 160 farmout acres), then the consenting parties would hold only 210 of the 480 acres—a minority interest.

Yet to be resolved is the result if the district court finds that all acreage within the 640–acre drilling block must be accounted for as consenting or non-consenting *and* that the parties' ownership inter-

---

**5.** It cannot be established from this record what finite decision was made by the appellees as holders of non-consent acreage. They could have either "bet against the box" that Moncrief would not corral a majority interest or, conversely, they may have concluded that Moncrief could not possibly get a majority interest since the Amoco acreage would not, as a matter of law, be counted. Finally, they may not have approved that the well drilling economics would be sufficient to justify consent participation compared to the results of standing by in non-consent. In other words, the decision may have been economics, it may have been legal, or perhaps some risk in application of both.

ests should be assessed when the parties elect to participate or to not participate in the well. This answer depends on who owned the interest in the 160 farmout acres when the elections were made and whether that party was a consenting or nonconsenting party.

We noted earlier that Moncrief and Yates would not earn an equitable interest in the farmout acreage until the well was commenced. Logically, then, when the elections were made (prior to commencement of the well), Amoco still held title to the 160 farmout acres.

The next question, then, is whether Amoco, under these circumstances, should be considered a consenting or a non-consenting party. The only reasonable answer to this question is that Amoco authorized Moncrief to consent on its behalf when it executed the Farmout Agreement with Moncrief. All parties owning an interest in the drilling unit knew Moncrief and Yates intended the acreage to be counted as consenting, and that they intended to, and in fact did, bear the proportion of the drilling costs attributable to that acreage. Under this scenario, the consenting parties again hold a majority interest.

We do not consider it a problem that Amoco was not a party to the Supplemental UOA. It was a party to the Revised UOA, and that agreement governs the deep rights (at issue in this case) of all interest holders not parties to the Supplemental UOA. If Amoco had not farmed out the 160 acres to Moncrief and Yates, and Amoco had elected not to participate in the well (appellees never denied Amoco had this right), it would have been subject to the penalties outlined in the Revised UOA. That Amoco was not subject to the greater penalties under the Supplemental UOA has no bearing on our decision. The parties to the Supplemental UOA agreed to its severe penalty provisions knowing that not all of the parties to the Revised UOA were signing on to it, and that the Revised UOA would continue to govern those parties' rights at all depths.

## VI. CONCLUSION

We reverse the district court's entry of summary judgment and remand for further proceedings consistent with this opinion.

THOMAS, Justice, dissenting, with whom GOLDEN, Justice, joins.

I am compelled to dissent in this case. I am satisfied the district court correctly ruled that Moncrief, MYCO, and Yates did not constitute a majority in interest at the time the consents were sought for the drilling of the exploratory well in the Madden Deep Unit. I perceive two major fallacies in the majority opinion. The first of these is that, upon analysis, it is clear the majority affords to Moncrief the authority to vote the Amoco acreage prior to the execution of the farmout agreement. That authority must depend upon only the commitment by Amoco to the farmout agreement. The second major fallacy is the extension of the doctrine of equitable conversion to the facts of this case and in a way that requires the equitable conversion to have occurred as early as the time of the commitment to execute the farmout agreement.

For purposes of this case, the commitment to the farmout agreement by Amoco was of no more significance than a kiss in a courtship. Certainly, a kiss is not going to make anyone pregnant, and Moncrief did not want to risk conception until he believed he had lined up the requisite support for the baby. I am satisfied that Moncrief did not intend to execute the farmout agreement unless he believed that he had secured consents from a majority of the parties to the revised and supplemental unit operating agreements. With that accomplished, he either had adequate contribution to the expense of the drilling of the well or the opportunity for a handsome windfall from forfeited interests if the well were successful.

I find no ambiguity in any of the contractual documents, and I am satisfied these parties made every effort to avoid any language that would necessitate construction of their agreements. There cannot be any doubt that all of the acreage within a drilling block must be counted as consenting or

non-consenting, and the assertion to the contrary in the majority opinion is forced and illusory. Neither is there any question that the parties were required to advise of their election not to participate within thirty days of the notice provided for in the Supplemental UOA. That does not suggest that the time for determining the assessment of interests is indefinite.

The chronology of this case is important. On May 1, 1967, the parties to this dispute, or their predecessors in interest, entered into a unit operating agreement for the Madden Deep Unit (Unit Agreement) covering about 70,000 acres in Natrona and Fremont Counties. The tract of land at issue in this case, the NE ¼ of Section 12, Township 38 North, Range 89 West, 6th P.M., is included in the Unit Agreement. The well that was drilled pursuant to the farmout agreement with Amoco is located in this quarter-section.

On June 17, 1969, the parties to the Unit Agreement entered into a Revised Unit Operating Agreement (Revised UOA). The parties to the Revised UOA include, among others, appellants, Amoco, and appellees, or their respective predecessors in interest. As to all parties, the Revised UOA governs operations at depths above the base of the Waltman Shale.

On June 2, 1975, some of the parties to the Revised UOA, or their successors in interest, entered into a Supplemental UOA to govern operations at depths greater than 5,500 feet below the base of the Waltman Shale. The parties to the Supplemental UOA were: (1) Moncrief; (2) Inexco Oil Company; (3) Sohio Petroleum Company; (4) North Central Oil Corporation; (5) W.R. Grace and Company; (6) Colorado Oil & Gas Corporation; (7) Yates; (8) Martin Yates, III (now MYCO's interest); (9) Harold B. Ehrlich; and (10) Monsanto Company (now BHP Petroleum Company, Inc.).

Several owners of committed working interests in the Unit, who were bound by the Revised UOA, including Amoco, did not execute the Supplemental UOA. Those parties deep rights, the rights below 5,500 feet, continued to be governed by the Revised UOA. Either the Revised UOA or the Supplemental UOA, or both, apply to the Madden Deep Unit operations, depending upon the depth of the drilling and the parties that are participating in the development.

In May of 1990, Moncrief obtained a commitment from Amoco to execute a farmout agreement (Farmout Contract) covering the subject lands. The Farmout Contract was finalized on July 5, 1990. The pertinent language of the Farmout Contract is:

2. Farmee [Moncrief], on or before December 31, 1990, agrees to commence or to participate in, as to Farmer's interest, the actual drilling of a test well at a legal location in the NE/4 of Section 12, Township 38 North, Range 89 West, Natrona County, Wyoming. Said well, once commenced, shall be continuously prosecuted, with due diligence and in a workmanlike manner, to a subsurface depth of 20,000 feet or to a subsurface depth sufficient to test the Cody formation, whichever is the lesser depth ("contract depth"), and shall then be completed as a producing well, a well capable of production, or plugged and abandoned within ninety (90) days from the date of commencement. Said test well shall be drilled at Farmee's sole cost, risk and expense. Except as provided in the takeover provision of Paragraph 5 hereof, the costs associated with testing, completing, equipping or plugging and abandoning said test well, as applicable, shall also be borne solely by Farmee. All contributions to the test well shall be owned solely by Farmee.

\* \* \* \* \* \*

6. If Farmee has drilled the test well to contract depth in accordance with the terms of this agreement and has otherwise complied with the terms hereof, Farmor agrees, upon written request within thirty (30) days of the date the test well is (check one) \* \* \* (b) completed as a producing well in paying quantities or as a well capable of producing or is plugged and abandoned, to execute and deliver to Farmee an assignment of all of its right, title and interest in and to

the Subject Lands, reserving unto Farmor an overriding royalty of twelve and one-half percent of eight-eights (12.5% of ⅝).

The Farmout Contract was modified by a letter agreement within three weeks, and prior to any drilling, pursuant to which Moncrief advised Amoco:

> Enclosed herewith is one fully executed copy of the captioned Agreement dated July 5, 1990 [the Farmout Contract] **subject to your acceptance of the following changes thereto:**
>
> * * * * * *
>
> 5) Farmee [Moncrief] agrees to use his best efforts in accordance with good oil field practice to complete the test well as a producer of oil or gas, **but shall not be firmly obligated to drill the well. The only liability or penalty for failure to drill will be the forfeiture of all rights hereunder.** (Emphasis added)

Apparently this is among the "later minor modifications not relevant to this dispute's resolution" alluded to on page —— of the majority opinion. With candor, but tellingly, Moncrief admits in his brief:

> The Farmout Contract, under which **Moncrief has the right (but not the obligation) to earn the lease by drilling the Well,** is in the nature of an option. (Emphasis added).

Appellant's Brief at 19.

By letter dated May 31, 1990, Moncrief notified other working interest owners in the Madden Deep Unit that he had obtained the farmout from Amoco; that he was designating as a "Drilling Block" all of Section 12; and that he was proposing to drill the Well in that section. The letter offered the right to participate in the costs of the Well in order to "earn" participation in Moncrief's Farmout Acreage, and gave all parties 30 days to respond. This letter was sent even though the Farmout Contract was not executed until July 5, 1990, some five weeks after Moncrief notified the other working interest owners that he had obtained it.

Moncrief commenced the well on the designated drilling block on August 24, 1990. On April 2, 1991, the well was drilling at a depth below 20,000 feet. Twenty-five percent of the costs of the well were allocable to the NE ¼ of Section 12, and Moncrief and Yates were bearing those allocable costs. As provided in the Supplemental UOA, the Consenting Parties bore the costs of drilling in proportion to their shares of the drilling acreage.

The penalty for non-consent by the parties to the Supplemental UOA, if they are a minority in interest, is draconian indeed. It is designed to force those who find themselves a minority to participate in the cost of discovery or forfeit their interests. Article 10, Paragraph 10.4, of that agreement reads in pertinent part:

> In the event any Party hereto should become a Non–Consenting Party as regards the Drilling of an Exploratory Well as to which a majority in interest hereunder have constituted the Consenting Parties such Party shall, promptly following the Drilling of said well to its total depth in substantial compliance with the proposal, assign to the Drilling Parties in the proportion in which they participate therein all of the right, title, and interest of such Non–Consenting Party in and to the leases owned by it [according to specific instructions].

The alternative for non-consent by parties to the Supplemental UOA, if they are not a minority in interest, is severe in and of itself because they are required to pay a penalty of 1000% of the drilling costs and the cost of newly acquired equipment to and including the wellhead connections.

Pursuant to the letter of May 31, 1990, Moncrief, Yates, MYCO, and Grace Petroleum "consented" to participate in the well. While the Appellees, The Louisiana Land and Exploration Co., BHP Petroleum (Americas) Co., Inc., Inexco Oil Co., and

North Central Oil Corporation elected not to do so. By letter dated August 30, 1990, Moncrief furnished to all working interest owners a list of which parties had consented to participate in the well and also how Moncrief calculated all parties' acreage so that it could be determined whether those parties who would drill the well constituted a "majority in interest" in the Drilling Block. According to Moncrief's calculations, the consenting parties made up a "majority in interest." In those calculations, Moncrief included all 160 acres subject to the Amoco farmout. Those 160 acres should not be included for the reasons outlined by the district court and as discussed below.

On September 6, 1990, Moncrief brought this action seeking a declaration that, as defined by the Supplemental UOA, the Consenting Parties constituted a "majority in interest" in the 640 acre drilling block.[1] In its Decision Letter Opinion filed on September 18, 1991, the district court concluded that "[t]he critical time for assessing the ownership interests was when Moncrief proposed the drilling of the well. * * * The Defendants had a right to consent or not based upon the circumstances as they were prior to commencement of drilling." In addition, the district court found, as a matter of law, that the farmout acreage should not be counted as consenting acreage and that appellants were therefore a minority in interest. I agree and would affirm the district court.

It is clear that the resolution of this case depends upon whether the Amoco acreage, purportedly voted by Moncrief pursuant to a right to do so under the Farmout Contract is to be counted as consenting or non-

consenting. Moncrief counted it as consenting acreage, and the district court found to the contrary. The decision of the district court was correct.

After Moncrief's letter modifying the terms of the Farmout Contract, the Farmout Contract was an option-to-drill agreement as discussed on page 505 of the majority opinion. The majority opinion is not correct in asserting that the Farmout Contract became a bilateral contract if Moncrief exercised the option by commencing drilling prior to December 31, 1990. Moncrief had no obligation to drill, and he could earn the farmout acreage only by completing the well as required in the agreement. The condition for earning the farmout acreage was that the well had to be drilled to the contract depth. Moncrief's letter amending the Farmout Contract serves to distinguish this case from *Davis v. Zapata Petroleum Corp.*, 351 S.W.2d 916 (Tex.Civ. App.1961).

The appellants also contend that they have a carried working interest in this acreage. The terms "carried working interest" and "carried interest" are not defined in the Supplemental UOA, but relying on the authority cited in the Brief of Appellees at 15–17,[2] I would agree that this particular Farmout Contract does not create a carried working interest of the farmor's acreage. A carried interest is created from an arrangement between two or more owners of a working interest. Under the Farmout Contract, only Amoco owned the working interest. Moncrief could not obtain any part of the working interest until he fulfilled his contract duties to drill the well. Since only one party, Amoco, owned the working interest, there can be no carried interest.

1. In March of 1991, Amoco assigned record title in the lease to Moncrief.

2. HOWARD R. WILLIAMS & CHARLES J. MEYERS, MANUAL OF OIL AND GAS TERMS 104 (6th ed. 1984); HOWARD R. WILLIAMS & CHARLES J. MEYERS, MANUAL OF OIL AND GAS TERMS 113–14 (7th ed. 1987); Gary B. Conine, *Rights and Liabilities of Carried Interest and Nonconsent Parties in Oil and Gas Operations*, 37 SW.LEGAL FDN.OIL & GAS INST. 3–10 to 3–12 (1986).

Appellants also argue that the Farmout Contract has been amended to afford to Moncrief title to the working interest in that acreage. The trial court concluded that the proposed amendment was not relevant because the critical time for assessing the ownership interests was when Moncrief proposed the drilling of the well. I am in complete accord with this decision. When Moncrief proposed the drilling of the well by his May 31, 1990 letter, Amoco was the owner of the lease and the working interest in that lease, and Moncrief had only a commitment to enter into a Farmout Contract. Since Moncrief acquired no interest until the completion of the well, he could not vote the farmout acreage with his own acreage in calculating whether there was a consenting majority.

The majority cites one case for the proposition that a farmee can earn equitable title to farmout acreage. *See Cities Service Oil Co. v. Pubco Petroleum Corp.*, 497 P.2d 1368 (Wyo.1972). Commenting on the farmout relationship, the majority quotes: "Colorado [Corporation] had no legal title until the contemplated well had been completed. However, it did have a potential or equitable interest[.]" Based on this tenuous language, the majority extends the doctrine of equitable conversion to farmout contracts. The *Cities Service* case did not address the doctrine of equitable conversion. It was concerned only with the right of a driller of the well to enforce a lien not only against the interest of the company with which it had contracted, but also against the overriding royalty interest. The entire quote from which language is abstracted by the majority is informative:

Colorado had no legal title until the contemplated well had been completed. However, it did have a potential or equitable interest; **and courts recognize equitable liens.** But it must be remembered that Colorado's equitable and future interest or rights were at all times

subject to a reservation by Cities of its overriding royalty. Therefore, Pubco could not acquire lien rights against the legal or equitable rights of Colorado, without those rights being subject to Cities' reservation of its overriding royalty.

*Cities Service*, 497 P.2d at 1373 (emphasis added).

I do not believe the court contemplated that this language would later be used out of context to support an extension of the doctrine of equitable conversion to farmout contracts.

We held as early as 1914 that the doctrine of equitable conversion does not apply to an option. *Olds v. Little Horse Creek Cattle Co.*, 22 Wyo. 336, 140 P. 1004 (1914). In my judgment the doctrine of equitable conversion could not possibly be applied until the completion of the well. At that juncture, the farmee would have the right to have the acreage transferred, and I would accept the doctrine of equitable conversion at that point. Until the condition of performance was accomplished, however, the contract was unilateral, not bilateral. Amoco could not revoke its offer, but the only way that Moncrief could achieve acceptance was by completion of the well. In this regard, the resolution in *Metropolitan Mortgage and Sec. Co., Inc. v. Belgarde*, 816 P.2d 868 (Wyo.1991), is clear. That case refutes any suggestion from the general authority cited, and relied upon, in the majority opinion to support the application of the doctrine of equitable conversion. Under his letter amendment to the Farmout Contract, Moncrief had no obligation to drill the well, and he could only achieve the rights of an equitable owner by completion of the well, the condition precedent to performance by Amoco.

In their brief, the appellees place the matter in perspective when they say:

[T]he language quoted from the two documents makes it quite clear that the

Farmout was an option contract, which created no duties on Amoco's part *until Moncrief had performed in full.* With the clarity of the language in the July 20, 1990 letter, how can Moncrief assert here, as he did in the District Court, that although he had absolutely no obligation to drill the Well and therefore faced no liability if he failed to do so, he nonetheless had already "earned" a valuable property interest *at some point prior to completing the Well to "contract depth"?* Under this Farmout Contract and at their sole peril, the Appellants could have spent literally millions of dollars and drilled thousands of feet only to have "earned" nothing if they failed to reach contract depth for whatever reason.

Brief of Appellees at 11.

I dissent from the resolution set forth in the majority opinion, and I would affirm the district court.